**Gerard S. REDER, Plaintiff,**

v.

**The TRAVELERS PLAN ADMINISTRATORS OF CONNECTICUT, INC., Defendant.**

**No. Civ.A. 96–30180–MAP.**

United States District Court,
D. Massachusetts.

March 31, 1999.

94

Thomas Curley Campoli & Campoli, Pittsfield, MA, Judith C. Knight, Camploli & Curley, Pittsfield, MA, for Gerard S. Reder, plaintiff.

Elizabeth Graham, Edward P. O'Leary, Tonomey A. Coleman, Fitzhugh & Associates, Boston, MA, for Travelers Plan Administrators of Connecticut, Inc., defendant.

## MEMORANDUM REGARDING REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

PONSOR, District Judge.

### I. INTRODUCTION

Gerard S. Reder ("plaintiff" or "Reder"), owner of Berkshire Armored Car ("BAC") and Berkshire Armored Car of Florida ("BAC Florida") has sued The Travelers Plan Administrators of Connecticut, Inc. ("TPA"), asserting claims for negligence (Count I), gross negligence (Count II), indemnification (Count III), and violation of the Employee Retirement Security Act, 29 U.S.C. § 1001 *et seq.* ("ERISA") (Count IV). Plaintiff claims he was injured when a jury awarded damages against him in a Florida lawsuit by a BAC Florida employee. This lawsuit asserted that Reder, in his individual capacity, committed a breach of contract by failing to provide the employee and his wife health insurance. Reder claims that he failed to provide the insurance as a result of misinformation

provided by TPA to an agent of BAC making an inquiry about a group health plan sponsored and administered by BAC.

Defendant moved for summary judgment on each of plaintiff's claims. That motion was referred to Magistrate Judge Kenneth P. Neiman for a Report and Recommendation. The Magistrate Judge issued his Report and Recommendation on March 12, 1999, recommending that TPA's motion be granted as to all of plaintiff's claims. Plaintiff has now filed an objection to the Report and Recommendation as to Counts I through III. Plaintiff does not object to the recommendation to dismiss the ERISA claim in Count IV.

The court will adopt the Report and Recommendation in its entirety and will grant TPA's motion for summary judgment as to all counts asserted by plaintiff. Because the Report and Recommendation addresses virtually all of the issues presented in this case, an extended discussion is unnecessary. However, plaintiff has raised one narrow issue in his objection to the recommendation to dismiss plaintiff's negligence claims (Counts I and II) that merits brief discussion.

## II. *FACTS*

The pertinent facts of record are set forth in detail in the Report and Recommendation at pages 95–96. They are essentially undisputed and, therefore, will only be summarized here.

At all relevant times, plaintiff was President and owner of BAC and BAC Florida. BAC was the sponsor and administrator of an employee health insurance plan covered under ERISA. BAC's vice president, Debra Gable ("Gable"), was the appointed fiduciary of the plan. Defendant TPA served as the third-party administrator of the Plan; among other things, it provided advice to BAC regarding eligibility requirements of the Plan.

In August of 1993, Gable contacted Deborah Betts ("Betts"), the TPA agent responsible for answering eligibility questions, and inquired whether Richard Carney ("Carney"), an employee of BAC Florida, was eligible to enroll in the BAC health plan. Betts informed Gable that Carney was ineligible to enroll in the plan. This information later proved to be incorrect.

As a result of not having been enrolled in a health plan, Carney and his wife became responsible for medical expenses incurred by his wife. Carney and his wife sued both BAC Florida and plaintiff individually in Florida state court and were awarded $76,672.53. The Carneys' Florida action against Reder was based on his breach of an oral contract in which he personally promised that the Carneys would receive health insurance. The Carneys' claim against BAC Florida was for breach of an employment contract in which Reder, acting in his capacity as President of BAC Florida, bound the company to provide group health insurance coverage for the Carneys.

## III. *DISCUSSION*

Magistrate Judge Neiman concluded that plaintiff's negligence claims (Counts I and II) were not viable because, as a matter of law, TPA did not owe Reder any duty in his individual capacity. Plaintiff objects to the Report and Recommendation, asserting that those claims survive summary judgment scrutiny under the principles set forth in *Nycal Corporation v. KPMG Peat Marwick LLP*, 426 Mass. 491, 688 N.E.2d 1368 (1998) and Restatement (Second) of Torts § 552 (1972). Essentially, plaintiff claims that TPA's duty to BAC flowed to him, in his individual capacity, as sole owner and corporate officer of that entity. Plaintiff objects to the technical distinction he believes the Magistrate Judge drew between plaintiff, the owner or corporate officer of BAC, and plaintiff, the individual. Plaintiff's argument is addressed below.

In *Nycal*, the Supreme Judicial Court grappled with the difficult issue of the scope of an accountant's liability in provid-

ing information for guidance to others in the commercial setting. In that case, Nycal Corporation ("Nycal") sued the accounting firm Peat Marwick for injuries sustained by Nycal as a result of its reliance on an auditors' report prepared by Peat Marwick. *See id.* at 492, 688 N.E.2d 1368. The accounting firm had been retained by Gulf Resources & Chemical Corporation ("Gulf") to prepare the audit for inclusion in Gulf's annual report. *See id.* When it prepared the audit, Peat Marwick was aware of at least one company that had given initial indications that it was planning a hostile takeover of Gulf. *See id.* The accounting firm was not, however, specifically aware of any interest on the part of Nycal in acquiring Gulf's stock. *See id.* at 493, 688 N.E.2d 1368.

Following the preparation of the auditors' report and its inclusion in Gulf's annual report, Gulf and Nycal entered into discussions regarding a possible stock purchase of Gulf by Nycal. *See id.* In connection with such discussions Gulf provided Nycal with a copy of its annual report. In reliance on the auditors' report prepared by Peat Marwick contained therein, Nycal purchased thirty-five percent of Gulf's outstanding shares of stock for $16,000,000 in cash and $18,000,000 in Nycal's stock. The acquisition gave Nycal operating control of Gulf. *See id.* Shortly after the purchase, Gulf went bankrupt, rendering Nycal's investment worthless. *See id.* at 492, 688 N.E.2d 1368.

Nycal sued the accounting firm, asserting negligence and alleging that the report materially misrepresented the financial condition of Gulf. *See id.* The trial court granted Peat Marwick's motion for summary judgment and, thereafter, the Supreme Judicial Court granted the parties' application for direct appellate review. *See id.*

The focus of the Supreme Judicial Court's inquiry was the appropriate standard of liability applicable to an accounting firm with respect to information disseminated in its report. *See id.* at 493, 688 N.E.2d 1368. Nycal urged the court to adopt a broad standard of liability, based on foreseeability and traditional notions of tort liability. *See id.* at 493, 688 N.E.2d 1368. The court rejected this standard, concluding that, among other things, client-controlled dissemination of such information would expose accountants to "liability in an indeterminate amount for an indeterminate time to an indeterminate class." *Id.* The court also rejected the defendant's proposed near-privity test as too strict. *See id.* at 494–95, 688 N.E.2d 1368. Under that test, an accountant would face liability to non-contractual third parties only if he were aware that the information "was to be used for a particular purpose, in the furtherance of which a known party (or parties) was intended to rely, and if there was some conduct on the part of the accountant creating a link to that party." *Id.* at 494, 688 N.E.2d 1368.

Instead, the court in Nycal adopted a standard of liability that rests on a middle ground between the broad foreseeability test and the strict near-privity test. *See id.* at 496–99, 688 N.E.2d 1368. That standard, which plaintiff asserts is applicable in this case, is set forth in Restatement (Second) of Torts § 552 (1977). It provides, in pertinent part, as follows:

> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

That liability is limited to:

> loss suffered (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and (b) through reliance upon it in a transaction that he intends the information to influ-

ence or knows that the recipient so intends or in a substantially similar transaction.

The comment to section 552 of the Restatement makes clear that

[i]t is enough that the maker of the representation intends it to reach and influence either a particular person or persons, known to him, or a group or class of persons, distinct from the much larger class who might reasonably be expected sooner or later to have access to the information and foreseeably to take some action in reliance upon it... It is sufficient, in other words, insofar as the plaintiff's identity is concerned, that the maker supplies the information for repetition to a certain group or class of persons and that the plaintiff proves to be one of them, even though the maker never had heard of him by name when the information was given.

Based on such principles, the court in Nycal held that Peat Marwick's liability to noncontractual third parties was limited to those individuals "who can demonstrate 'actual knowledge on the part of accountants of the limited—though unnamed—group of potential [third parties] that will rely upon the [report], as well as actual knowledge of the particular financial transaction that such information is designed to influence.'" *Id.* at 498, 688 N.E.2d 1368. Accordingly, the court upheld the dismissal of Nycal's claim because "the facts failed to show that the defendant knew (or intended) that the plaintiff, or any limited group of which the plaintiff was a member, would rely on the audit report in connection with an investment with Gulf." *Id.* at 499, 688 N.E.2d 1368.

In this case, Reder's damages arise out of his failure to honor an oral contract made in his individual capacity to provide health insurance to Carney, an employee of BAC Florida. As in Nycal, there is simply no factual evidence in the record that would indicate that TPA or its agent knew or intended that Reder, or any limited group of which he was a member, would rely on the TPA advice in failing to honor his oral contract.

Contrary to plaintiff's suggestion in his objection to the Report and Recommendation, it is inconsequential that plaintiff was the owner of BAC, the company to which TPA was responsible for providing eligibility advice. This is true even if, as plaintiff contends, TPA had a duty to BAC that, in turn, flowed to plaintiff in his capacity as owner or corporate officer of that entity. As noted above, plaintiff's damages did not arise out of his relationship with BAC, but, instead, resulted from a broken promise to an employee of his Florida company made in his individual capacity.[1]

## IV. CONCLUSION

For the reasons set forth in this opinion, TPA's motion summary judgement as to all of plaintiff's claims will be ALLOWED.

A separate order will issue.

NEIMAN, United States Magistrate Judge.

## *REPORT AND RECOMMENDATION REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Docket No. 36)*

Gerard Reder ("Plaintiff"), owner of Berkshire Armored Car ("BAC") and Berkshire Armored Car Florida ("BAC Florida"), filed a complaint in Berkshire Superior Court on August 16, 1996, against The Travelers Plan Administrators of Connecticut, Inc. ("TPA"). Plaintiff's complaint sought indemnification for an amount paid by him in satisfaction of a judgment rendered against him and BAC Florida, jointly and severally, for $97,500, in a case brought in Florida District Court. That case was brought by Plaintiff's for-

---

1. Because the court has found that plaintiff's negligence and indemnification claims lack substantive merit, it is unnecessary to address the alternative argument that they are preempted by ERISA.

mer employee, Richard Carney ("Carney"), who sued not only Plaintiff, BAC, BAC Florida, but TPA as well, for payment of medical costs which he alleged were due him pursuant to BAC's health insurance plan enacted pursuant to the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et. seq.* ("ERISA"). BAC and TPA were voluntarily dismissed from the Florida District Court case prior to trial.

As originally filed, Plaintiff's complaint made claims of negligence (Count I), gross negligence (Count II) and indemnification (Count III) against TPA. Defendant removed the complaint to this court on September 20, 1996, alleging that ERISA preempts these common law causes of action. There is also diversity between the parties. Plaintiff subsequently amended his complaint on October 30, 1996, to add an ERISA count (Count IV).

Before the court is Defendant's motion for summary judgment on all counts. Defendant alleges that it is entitled to a judgment as a matter of law because ERISA preempts all of Plaintiff's state law claims. Should the court find that ERISA does not preempt Plaintiff's claims, Defendant asserts that Plaintiff lacks standing to assert ERISA based rights. Defendant also alleges that it may not be held responsible for money damages under the statute and that Plaintiff suffered no injury as a result of TPA's actions.

Defendant's motion has been referred to the court for a report and recommendation pursuant to Rule 3 of the Rules of the United States Magistrates of the United States District Court for the District of Massachusetts. *See* 28 U.S.C. § 636(b)(1)(B). For the following reasons, the court will recommend that Defendant's motion be allowed.

## I. *SUMMARY JUDGMENT STANDARD*

In accordance with Fed.R.Civ.P. 56(c), summary judgment will be granted if "there is no genuine issue as to any mate-

rial fact" and "the moving party is entitled to a judgment as a matter of law." *Magee v. United States,* 121 F.3d 1, 3 (1st Cir. 1997). Once the moving party has demonstrated that no genuine issue of material fact exists, the burden is on the opposing party to contradict that demonstration by coming "forward with specific provable facts which establish that there is a triable issue." *Aponte Matos v. Toledo Davila,* 135 F.3d 182, 186 (1st Cir.1998). A genuine issue is one which a reasonable fact finder could resolve in favor of the non-moving party. *Id.*

Not every genuine factual conflict, however, necessitates a trial. "It is only when a disputed fact has the potential to change the outcome of the suit under the governing law if found favorably to the non-movant that the materiality hurdle is cleared." *Parrilla–Burgos v. Hernandez–Rivera,* 108 F.3d 445, 448 (1st Cir.1997) (internal quotations omitted). The facts are to be viewed in a light most favorable to the non-movant. *Dykes v. DePuy, Inc.,* 140 F.3d 31, 36 (1st Cir.1998). Summary judgment may be granted when there is no dispute as to any material fact and only questions of law remain. *Reich v. John Alden Life Ins. Co.,* 126 F.3d 1, 6 (1st Cir.1997).

## II. *FACTUAL BACKGROUND*

### A. *The Benefit Plan and Excess Insurance Coverage*

At all relevant times, Plaintiff was President and owner of BAC and BAC Florida. BAC was the plan sponsor and administrator and Debra Gable ("Gable"), BAC Vice President, was the appointed fiduciary of the Berkshire Armored Car, Inc. Health Benefit Plan ("Plan"). Pursuant to a Claims Administration Agreement ("Agreement"), TPA served as third-party claim administrator of the Plan and accordingly was to "process, adjust and settle claims ... for benefits under the Plan in accordance with the terms and conditions of the Plan." TPA served in this

capacity from February 1, 1992, until January 31, 1994.

The Agreement identified the roles, duties, responsibilities and liabilities of all parties to the various Plan contracts. BAC had absolute authority with respect to control, management, investment, disposition and utilization of Plan assets. Thus, BAC had sole authority and responsibility for the design of the Plan, decisions regarding individual eligibility, and payment of Plan benefits. Pursuant to this authority, BAC created specific requirements for employee and dependent eligibility under the Plan, including that no employee dependent's coverage would be effective prior to coverage of that employee.

The Agreement expressly provided that TPA was an administrative agent of BAC and not a fiduciary. Thus, TPA exercised no discretion, control or authority over assets. TPA provided advice to BAC regarding whether individuals met the Plan's eligibility requirements. One particular individual at TPA, Deborah Betts ("Betts"), was charged with answering eligibility questions with regard to BAC's plan.

The Plan was self-funded by BAC up to a prescribed limit. Excess insurance coverage beyond the limit was provided by Travelers Insurance Company ("Travelers") at a predetermined exposure level amount per Plan participant. The policy, therefore, was called a "stop-loss" policy. For example, under the stop-loss provision for policy year February 1, 1993, through January 31, 1994, BAC was required to pay the first $50,000 worth of medical costs for each covered individual and Travelers provided coverage for each individual whose claims exceeded this stop-loss threshold. Still, Travelers would not provide coverage for individuals who failed to meet eligibility requirements of the Summary Plan Description ("SPD").

In addition to the stop-loss trigger for excess individual coverage, there was also an aggregate trigger in Travelers' policy. Pursuant to this provision, Travelers was required to pay claims in excess of $185,-320.05 in total claims per year. For payment under either trigger, the claims must have been paid within the policy year in question.

## B. *Facts Relevant to Plaintiff's Claim*

In July of 1993, Gable, as BAC's Plan administrator, faxed a plan enrollment form to TPA for Carney and his dependent wife. At the time, Gable assumed that Carney was a BAC employee. On August 30, 1993, however, Gable became aware that Carney was an employee of BAC Florida, not BAC. Gable mentioned this to Plaintiff, BAC's owner. Plaintiff indicated to Gable that he did not believe Carney could be enrolled in the Plan as it was a Massachusetts plan and Carney was not a BAC employee. Gable then claims to have inquired of TPA on August 20, 1993, as to whether Carney could be enrolled in the Plan and was told that he could not.

Although Betts was solely responsible at TPA for answering eligibility-related questions regarding BAC's plan, she did not recall receiving any such question regarding Carney. As a result, Betts never consulted with her supervisor, as was her practice. Betts also testified that it was her standard practice to advise employers with eligibility questions that ineligible employees may be included in a plan with a separate agreement. The separate agreement, according to Betts, may have stop-loss ramifications.

According to Gable, she had inquired of someone at TPA who told her that her supervisor said unequivocally that Carney could not be included in the BAC plan. Given that information, Gable instructed TPA not to pay any claims for Carney or his wife. TPA denied all subsequent claims by Carney.

Carney then brought suit in Florida District Court against BAC, Plaintiff, TPA and BAC Florida for medical expenses incurred by his wife and for attorney's fees. Prior to trial, an order of dismissal

with prejudice entered as to TPA and BAC. At trial, the Carneys were awarded a $76,672.53 judgment against Plaintiff and BAC Florida for past and future medical expenses. However, the judgment was paid by cashier's check drawn on BAC's account. The present litigation then ensued.

## III. *DISCUSSION*

### A.

Various enumerated parties—most particularly, a participant, beneficiary, or fiduciary in certain limited circumstances inapplicable here—may maintain civil enforcement actions under ERISA to recover benefits due under an ERISA health plan. 29 U.S.C. §§ 1002(7),(8). Although there is a split in the circuits as to whether an unenumerated party might have independent statutory standing to sue under ERISA, *see Hermann Hosp. v. MEBA & Med. Benefits Plan,* 845 F.2d 1286, 1287–88 (5th Cir.1988), it appears that in this circuit the list of parties to which a jurisdictional grant has been explicitly given is exclusive. *See Kwatcher v. Mass. Serv. Emp. Pension Fund,* 879 F.2d 957, 964 (1st Cir.1989). This court has so held. *I.V. Servs. of America, Inc. v. Inn Development Management, Inc.,* 7 F.Supp.2d 79, 83 (D.Mass.1998).

■ Given that exclusivity, TPA argues that it is entitled to a judgment as a matter of law on Count IV, the ERISA count, as Plaintiff lacks standing to pursue a claim under ERISA. An employer is not generally considered a participant or beneficiary under the plan. 29 U.S.C. § 1132(a)(1)(B). Even an employer adjudged responsible for payment of benefits, is not an enumerated party for the purposes of 29 U.S.C. § 1002.

Plaintiff does not contend that he is an enumerated party under the statute. In fact, he essentially conceded at oral argument that he likely lacks standing to pursue his ERISA based claim, whether as an employer or in his individual capacity. In addition, Plaintiff does not contend that Carney is an enumerated party, which might give rise to standing on Plaintiff's part under an assignment of rights theory. *Compare I.V. Services,* 7 F.Supp.2d at 83 (health care provider may obtain derivative standing as an assignee of health care benefits from a plan participant). Accordingly, the court will recommend that summary judgment be allowed on Count IV of Plaintiff's complaint.

### B.

■ Defendant also moves for summary judgment on Plaintiff's remaining counts, alleging that ERISA preempts all the common law claims at issue. Defendant asserts that Plaintiff's lack of standing will not effect the preemption analysis regarding these claims. The court agrees. ·The inquiries, while interrelated, are different. *Mullins v. Blue Cross and Blue Shield of Virginia, Inc.,* 859 F.Supp. 206, 207 n. 4 (W.D.Va.1994). *See Cromwell v. Equicor–Equitable HCA Corp.,* 944 F.2d 1272, 1278 (6th Cir.1991). *But see Weaver v. Employers Underwriters, Inc.,* 13 F.3d 172, 177 (5th Cir.1994)(citing cases which required standing before preemption could apply).

### 1.

ERISA governs plans which provide employees with "medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability [or] death" whether benefits are provided "through the purchase of insurance or otherwise." 29 U.S.C. § 1002(1). Congress crafted ERISA with a broad preemption clause. Specifically, 29 U.S.C. § 1144(a) provides that ERISA "shall supersede any and all state laws insofar as they relate to any employee benefit plan covered by the statute." ERISA broadly defines state law as inclusive of "all laws, decisions, rules, regulations or other state actions having the effect of law." 29 U.S.C. § 1144(c)(1).

The explicit preemptive intent of ERISA was acknowledged by the Supreme Court in *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983). As the court explained, Congress intended to protect plan participants and beneficiaries through preemption by providing for uniformity amongst plans. Congress also intended that preemption minimize administrative and financial burdens on participating plans by alleviating the need to comply with potentially conflicting state laws. *Id.* at 98–99, 103 S.Ct. 2890.

■ The Supreme Court later explained that state law "relates to" and thus preempts an ERISA plan "if it has a connection with or reference to such a plan." Thus, certain claims may be preempted even when the claimant is not seeking benefits under an ERISA plan so long as the claim is "premised on the existence of an ERISA-covered pension plan." *District of Columbia v. Greater Washington Bd. of Trade*, 506 U.S. 125, 130, 113 S.Ct. 580, 121 L.Ed.2d 513 (1992) (internal quotations marks and citations omitted). The Court has specifically held that state common law breach of contract and tort claims that "relate to" an ERISA-covered plan are preempted. *Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990); *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985). *See Turner v. Fallon Community Health Plan, Inc.*, 127 F.3d 196, 199 (1st Cir. 1997); *Carlo v. Reed Rolled Thread Die Co.*, 49 F.3d 790, 794 (1st Cir.1995); *Toomey v. Jones*, 855 F.Supp. 19, 27 (D.Mass. 1994). When viewed in this framework, TPA claims, Plaintiff's common law claims must fail.

■ In contrast, Plaintiff suggests that the reach of the preemption doctrine with regard to ERISA has been limited by *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 657, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995). That is true. Notwithstanding ERISA's broad preemptive language and intent, the Supreme Court explained, it "never assumed lightly that Congress has derogated state regulation, but instead addressed claims of pre-emption with the starting presumption that Congress does not intend to supplant state law." *Id.* at 654, 115 S.Ct. 1671 (citing *Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981)). Thus, even in ERISA cases, "where federal law is said to bar state action in fields of traditional state regulation," the Court explains it has consistently "worked on the 'assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Travelers*, 514 U.S. at 654, 115 S.Ct. 1671. (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)). Thus, not every "connection" or "reference" to a plan results in preemption. *Travelers*, 514 U.S. at 656, 115 S.Ct. 1671. At bottom, ERISA preemption applies when a state law mandates employee benefit strictures or their administration, binds employers or plan administrators to particular choices or precludes uniform administrative practice, or provides alternate enforcement mechanisms for employees to obtain ERISA plan benefits. *Id.* at 658, 115 S.Ct. 1671.

### 2.

■ The court believes that common law claims of general applicability, such as the ones at issue here, may in fact impose even fewer burdens on ERISA plans than the state statutes found by the Court to be unrelated to the ERISA plans at issue. *See California Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 117 S.Ct. 832, 136 L.Ed.2d 791 (1997); *De Buono v. NYSA–ILA Med. and Clinical Servs. Fund*, 520 U.S. 806, 117 S.Ct. 1747, 138 L.Ed.2d 21 (1997). Statutes of "general applicability impose some burdens on the administration of ERISA plans but nevertheless do not 'relate to' them within the meaning of

[ERISA]." *DeBuono*, 520 U.S. at 814, 117 S.Ct. at 1752. In this regard, common law claims of negligence, gross negligence and reimbursement, grounded in advice given by a plan administrator to an employer, cannot always be said to relate to benefit strictures or their administration. "The key to distinguishing between what ERISA preempts and what it does not lies . . . in recognizing that the statute comprehensively regulates certain relationships: for instance, the relationship between plan and plan member, between plan and employer, between employer and employee (to the extent an employee benefit plan is involved) and between a plan and trustee." *Gen. Amer. Life Ins. Co. v. Castonguay*, 984 F.2d 1518, 1521–22 (9th Cir.1993). Preemption will not apply to traditional common law causes of action that do not "implicate the relations among the traditional ERISA plan entities." *Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1469 (4th Cir.1996).

Plaintiff asserts that his claim—that TPA failed to use due care when giving advise about BAC's obligations under the plan—is grounded in "garden variety" negligence and therefore avoids ERISA's broad preemptive sweep. As framed by Plaintiff, the issue is whether TPA failed to use the due care and diligence of a reasonable professional administrator when offering a response to an inquiry posed by BAC's Plan fiduciary. In pursuing the issue, Plaintiff relies predominantly on *Delaney,* where the "gravamen of the claim [was] that the defendants, in their capacity as insurance professionals, negligently failed to obtain a replacement insurance plan" for the named plan beneficiary. Because common law may impose a duty of care on all types of professionals, the court concluded, a state law malpractice claim brought against the defendant insurance professionals was independent of ERISA in every way. *Id.* at 1471–72. The common law was found by the court to impose a duty of care of due diligence on all professionals regardless of whether the underlying subject is an ERISA plan. *Id.*

at 1471. *See also Arizona State Carpenters Pension Trust Fund v. Citibank (Arizona),* 125 F.3d 715, 723–24 (9th Cir.1997).

If Plaintiff was suing in his capacity as an employer, his argument might have more force. Arguably, TPA could be said to owe a duty to BAC, if not BAC Florida, to act in a professional manner, as *Delaney* opines. Although the First Circuit has not yet spoken on this discrete issue, Plaintiff's negligence claim, and for that matter his gross negligence claim, might survive Defendant's preemption challenge—particularly given the growing trend in the circuits following *Travelers* to retrench from total preemption of ERISA-related claims.

Plaintiff, however, makes no pretense about trying to pursue this case as an employer. Indeed, Plaintiff makes clear that he is maintaining this suit against Defendant in his individual capacity, if for no other reason than to distance himself from invoking an ERISA plan and thereby risking preemption. Thus, Plaintiff has constantly asserted that the Plan, and the relationship between plan entities, need not be scrutinized to make a determination in this case.

■■■■ Despite its explication of preemption, the court finds it unnecessary to determine the scope of ERISA preemption here. As Defendant asserts, even if ERISA does not preempt Plaintiff's claim, the economic loss doctrine bars his recovery. The traditional rule is that "when a defendant interferes with a contract or economic opportunity due to negligence and causes no harm to either the person or property of the plaintiff, the plaintiff may not recover for a purely economic losses." *Garweth Corp. v. Boston Edison,* 415 Mass. 303, 613 N.E.2d 92, 94 (1993).

■■■■ Granted, Plaintiff asserts that an inquiry under section 522 of the Restatement (Second) of Torts (1977) is more closely analogous and should apply. Liability under section 522 is specifically pred-

icated on negligent misrepresentations made in the commercial context where a professional is employed to provide guidance for others. As the Restatement explains,

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Restatement (Second) Torts § 522 (cited in *Nycal Corp. v. KPMG Peat Marwick LLP*, 426 Mass. 491, 688 N.E.2d 1368, 1371–72 (1998)). However, a key element in a section 522 analysis is that, in order for a party to owe a duty, it has to possess actual knowledge of a third party, and the third party's reliance on the information at issue, at the time the alleged misrepresentation is made. *See Nycal*, 688 N.E.2d at 1372. It is here where Plaintiff falters. Even under the most generous of standards, Plaintiff fails to establish what duty was owed to him individually.

 There can be no negligence unless a duty is owed and whether a duty is owed is a question of law. *Yakubowicz v. Paramount Pictures Corp.*, 404 Mass. 624, 536 N.E.2d 1067, 1070 (1989). Moreover, the duty must be established at the time of the alleged misrepresentation. *Id.* It is not measured at some later date. The relevant inquiry here, therefore, is whether TPA, when making representations to Gable, BAC's fiduciary, was aware at that moment that Plaintiff, a third party, would rely on those representations, not as an employer, but in his individual capacity. Plaintiff's claim that it was he who later paid the award rendered against both him and BAC Florida is of no moment. Although a factual dispute may exist about who actually paid the award, it is not relevant for purposes here.

At bottom, Plaintiff presents insufficient evidence as a matter of law to conclude the TPA owed him a duty in his individual capacity. The undisputed record demonstrates that Gable, acting as BAC's agent, contacted someone at TPA and stated that she "put an employee on the plan and now I know that they don't work for Berkshire of Massachusetts. They work for a different company. Berkshire Armored Car Services of Florida, Inc." Gable then inquired, "Can that person be on the plan." (PI. Facts (Docket No. 40) Exh. A.) Gable also claims that she was erroneously told, "No, the person cannot be on the plan because they don't work for Berkshire Armored Car Service of Massachusetts," and, in turn, communicated this information to Plaintiff.

Nothing in this exchange, assuming its accuracy for purposes here, indicates that the TPA employee could have reasonably anticipated that Plaintiff, in his individual capacity, would rely on the representation with respect to Carney's eligibility at the time it was made to Gable. Nor, does it appear to the court that, at the time, Plaintiff was in fact relying on that representation in his individual capacity. Only after Plaintiff was adjudged liable in the Florida action did he formulate the rationale that it was he—rather than Gable, or Gable as an agent of BAC—who relied on TPA's misrepresentation. The court will therefore recommend that summary judgment be allowed on the negligence claims, Counts I and II, at least as they are grounded in a purely common law negligence theory.

3.

 TPA also moves for summary judgment on Plaintiff's indemnification claim. That claim is largely based on the express terms of the Agreement between TPA and BAC under which BAC

> (and its directors, officers, shareholders and employees) [shall be held] harmless from any and all claims, lawsuits, settlements, judgments, costs, penalties, taxes and expenses, including attorney's fees, resulting from or in connection with this

Agreement where it is determined in a final judgment by a court of competent jurisdiction that the liability therefor was the direct consequence of gross negligence ... on the part of TPA.

(PI. Exhibit D at 7.)

In essence, Plaintiff seeks reimbursement for the payment he individually made on the judgment rendered against him and BAC Florida for breaching a promise to Carney. Plaintiff alleges that he was only adjudged liable due to TPA's gross negligence in rendering him advice. Plaintiff claims that he is entitled to indemnification under the Agreement as he is a director, officer, shareholder and employee of BAC.

As is obvious, the Agreement under which Plaintiff seeks indemnification is one which governs the relationship between TPA and BAC, not TPA and BAC Florida against whom judgment was rendered. It strains credulity to believe that the Agreement between BAC and TPA was meant to indemnify Plaintiff, who happens to be an officer of BAC, for a claim unrelated to BAC and rendered solely against him and BAC Florida. It seems odd, as well, that Plaintiff, who argues so vigorously that it was he alone who paid the judgment, seeks shelter in a corporate agreement on behalf of BAC. Even assuming that it was BAC's account from which the money was drawn, the plain language of the Agreement is explicit that indemnification is to occur only "in connection with [the] Agreement." To afford parties outside the Agreement the protection of the hold harmless clause runs counter to its clear meaning.

The court will therefore recommend that summary judgment be allowed on Count III as it relates to contractual indemnification. To the extent that Plaintiff claims that he is entitled to indemnification under common law, the court has already determined that the underlying claims of negligence must fail. Therefore, the common law indemnification claim falls of its own weight.

## IV. *CONCLUSION*

For the foregoing reasons, the court will recommend that summary judgment be allowed on Counts I–IV.[2]

March 12, 1999.

2. The parties are advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to these findings and recommendations must file a written objection with the Clerk of this Court **within ten (10) days** of the party's receipt of this Report and Recommendation. The written objection must specifically identify the portion of the proposed findings or recommendations to which objection is made and the basis for such objection. The parties are further advised that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court order entered pursuant to this Report and Recommendation. *See Keating v. Secretary of Health & Human Services,* 848 F.2d 271, 275 (1st Cir.1988); *United States v. Valencia–Copete,* 792 F.2d 4, 6 (1st Cir.1986); *Scott v.. Schweiker,* 702 F.2d 13, 14 (1st Cir.1983); *United States v. Vega,* 678 F.2d 376, 378–379 (1st Cir.1982); *Park Motor Mart v. Ford Motor Co.,* 616 F.2d 603, 604 (1st Cir.1980). *See also Thomas v. Arn,* 474 U.S. 140, 154–55, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985). A party may respond to another party's objections within ten (10) days after being served with a copy thereof.