## HESS *v.* INDIANA

No. 73–5290.   Decided November 19, 1973

PER CURIAM.

Gregory Hess appeals from his conviction in the Indiana courts for violating the State's disorderly conduct statute.[1]   Appellant contends that his conviction should be reversed because the statute is unconstitutionally vague, *Connally* v. *General Construction Co.,* 269 U. S.

---

[1] "Whoever shall act in a loud, boisterous or disorderly manner so as to disturb the peace and quiet of any neighborhood or family, by loud or unusual noise, or by tumultuous or offensive behavior, threatening, traducing, quarreling, challenging to fight or fighting, shall be deemed guilty of disorderly conduct, and upon conviction, shall be fined in any sum not exceeding five hundred dollars [$500] to which may be added imprisonment for not to exceed one hundred eighty [180] days." Ind. Code 35–27–2–1 (1971), Ind. Ann. Stat. § 10–1510 (Supp. 1972).

385 (1926), because the statute is overbroad in that it forbids activity that is protected under the First and Fourteenth Amendments, *Gooding* v. *Wilson*, 405 U. S. 518 (1972), and because the statute, as applied here, abridged his constitutionally protected freedom of speech, *Terminiello* v. *Chicago*, 337 U. S. 1 (1949). These contentions were rejected in the City Court, where Hess was convicted, and in the Superior Court, which reviewed his conviction.[2] The Supreme Court of Indiana, with one dissent, considered and rejected each of Hess' constitutional contentions, and accordingly affirmed his conviction.

The events leading to Hess' conviction began with an antiwar demonstration on the campus of Indiana University. In the course of the demonstration, approximately 100 to 150 of the demonstrators moved onto a public street and blocked the passage of vehicles. When the demonstrators did not respond to verbal directions from the sheriff to clear the street, the sheriff and his deputies began walking up the street, and the demonstrators in their path moved to the curbs on either side, joining a large number of spectators who had gathered. Hess was standing off the street as the sheriff passed him.

---

[2] The State contends that Hess failed to preserve his constitutional contentions in the state courts. But the record demonstrates that Hess moved to quash the affidavit for disorderly conduct in the City Court on the constitutional grounds that he is asserting in this Court. The State points out that, on appeal to the Superior Court, appellant received a trial *de novo* and did not again move to quash the affidavit in that court. But the refusal of the City Court to quash the affidavit was asserted as error by Hess on his appeal to the Superior Court, and his memorandum in support of his appeal pressed the constitutional contentions. Since the Supreme Court of Indiana considered and resolved each of Hess' constitutional contentions, it is apparent that it regarded Hess' actions in the state courts as sufficient under state law to preserve his constitutional arguments on appeal.

The sheriff heard Hess utter the word "fuck" in what he later described as a loud voice and immediately arrested him on the disorderly conduct charge. It was later stipulated that what appellant had said was "We'll take the fucking street later," or "We'll take the fucking street again." Two witnesses who were in the immediate vicinity testified, apparently without contradiction, that they heard Hess' words and witnessed his arrest. They indicated that Hess did not appear to be exhorting the crowd to go back into the street, that he was facing the crowd and not the street when he uttered the statement, that his statement did not appear to be addressed to any particular person or group, and that his tone, although loud, was no louder than that of the other people in the area.

Indiana's disorderly conduct statute was applied in this case to punish only spoken words. It hardly needs repeating that "[t]he constitutional guarantees of freedom of speech forbid the States to punish the use of words or language not within 'narrowly limited classes of speech.'" *Gooding* v. *Wilson, supra,* at 521–522. The words here did not fall within any of these "limited classes." In the first place, it is clear that the Indiana court specifically abjured any suggestion that Hess' words could be punished as obscene under *Roth* v. *United States,* 354 U. S. 476 (1957), and its progeny. Indeed, after *Cohen* v. *California,* 403 U. S. 15 (1971), such a contention with regard to the language at issue would not be tenable. By the same token, any suggestion that Hess' speech amounted to "fighting words," *Chaplinsky* v. *New Hampshire,* 315 U. S. 568 (1942), could not withstand scrutiny. Even if under other circumstances this language could be regarded as a personal insult, the evidence is undisputed that Hess' statement was not directed to any person or group in particular. Although the sheriff testified that he was offended by the language,

he also stated that he did not interpret the expression as being directed personally at him, and the evidence is clear that appellant had his back to the sheriff at the time. Thus, under our decisions, the State could not punish this speech as "fighting words." *Cantwell* v. *Connecticut*, 310 U. S. 296, 309 (1940); *Cohen* v. *California, supra,* at 20.

In addition, there was no evidence to indicate that Hess' speech amounted to a public nuisance in that privacy interests were being invaded. "The ability of government, consonant with the Constitution, to shut off discourse solely to protect others from hearing it is . . . dependent upon a showing that substantial privacy interests are being invaded in an essentially intolerable manner." *Cohen* v. *California, supra,* at 21. The prosecution made no such showing in this case.

The Indiana Supreme Court placed primary reliance on the trial court's finding that Hess' statement "was intended to incite further lawless action on the part of the crowd in the vicinity of appellant and was likely to produce such action." —— Ind. ——, ——, 297 N. E. 2d 413, 415 (1973). At best, however, the statement could be taken as counsel for present moderation; at worst, it amounted to nothing more than advocacy of illegal action at some indefinite future time. This is not sufficient to permit the State to punish Hess' speech. Under our decisions, "the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing *imminent* lawless action and is likely to incite or produce such action." *Brandenburg* v. *Ohio*, 395 U. S. 444, 447 (1969). (Emphasis added.) See also *Terminiello* v. *Chicago*, 337 U. S., at 4. Since the uncontroverted evidence showed that Hess' statement was not directed to any person or group of persons, it

cannot be said that he was advocating, in the normal sense, any action. And since there was no evidence, or rational inference from the import of the language, that his words were intended to produce, and likely to produce, *imminent* disorder, those words could not be punished by the State on the ground that they had "a 'tendency to lead to violence.'" —— Ind., at ——, 297 N. E. 2d, at 415.

Accordingly, the motion to proceed *in forma pauperis* is granted and the judgment of the Supreme Court of Indiana is reversed.

MR. JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE and MR. JUSTICE BLACKMUN join, dissenting.

The Court's *per curiam* opinion rendered today aptly demonstrates the difficulties inherent in substituting a different complex of factual inferences for the inferences reached by the courts below. Since it is not clear to me that the Court has a sufficient basis for its action, I dissent.

It should be noted at the outset that the case was tried *de novo* in the Superior Court of Indiana upon a stipulated set of facts, and, therefore, the record is perhaps unusually colorless and devoid of life. Nevertheless, certain facts are clearly established. Appellant was arrested during the course of an antiwar demonstration conducted at Indiana University in May 1970. The demonstration was of sufficient size and vigor to require the summoning of police, and both the Sheriff's Department and the Bloomington Police Department were asked to help university officials and police remove demonstrators blocking doorways to a campus building. At the time the sheriff arrived, "approximately 200–300 persons" were assembled at that particular building.

The doorways eventually were cleared of demonstrators, but, in the process, two students were placed under arrest.

This action did not go unnoticed by the demonstrators. As the stipulation notes, "[i]n apparent response to these arrests, about 100–150 of the persons who had gathered as spectators went into Indiana Avenue in front of Bryan Hall and in front of the patrol car in which the two arrestees had been placed." Thus, by contrast to the majority's somewhat antiseptic description of this massing as being "[i]n the course of the demonstration," the demonstrators' presence in the street was not part of the normal "course of the demonstration" but could reasonably be construed as an attempt to intimidate and impede the arresting officers. Furthermore, as the stipulation also notes, the demonstrators "did not respond to verbal directions" from the sheriff to clear the street. Thus, the sheriff and his deputies found it necessary to disperse demonstrators by walking up the street directly into their path. Only at that point did the demonstrators move to the curbs.

The stipulation contains only one other declaration of fact: that Sheriff Thrasher arrested the appellant, Gregory Hess, for disorderly conduct. The remainder of the stipulation merely summarizes testimony, particularly the testimony of Sheriff Thrasher, two female witnesses (both students at Indiana University) who were apparently part of the crowd, and Dr. Owen Thomas, a professor of English at the university. The only "established" facts which emerge from these summaries are that "Hess was standing off the street on the eastern curb of Indiana Avenue" and that he said, in the words of the trial court, "We'll take the fucking street later (or again)." The two female witnesses testified, as the majority correctly observes, that they were not offended by Hess' statement, that it was said no louder than statements by other demonstrators, "that Hess *did not appear* to be exhorting the crowd to go back into the street," that he was facing the crowd, and "that his state-

ment *did not appear* to be addressed to any particular person or group." (Emphasis added.)

The majority makes much of this "uncontroverted evidence," but I am unable to find anywhere in the opinion an explanation of why it must be believed. Surely the sentence "We'll take the fucking street later (or again)" is susceptible of characterization as an exhortation, particularly when uttered in a loud voice while facing a crowd. The opinions of two defense witnesses cannot be considered *proof* to the contrary, since the trial court was perfectly free to reject this testimony if it so desired. Perhaps, as these witnesses and the majority opinion seem to suggest, appellant was simply expressing his views to the world at large, but that is surely not the only rational explanation.

The majority also places great emphasis on appellant's use of the word "later," even suggesting at one point that the statement "could be taken as counsel for present moderation." The opinion continues: "[A]t worst, it amounted to nothing more than advocacy of illegal action at some indefinite future time." From that observation, the majority somehow concludes that the advocacy was not directed towards inciting imminent action. But whatever other theoretical interpretations may be placed upon the remark, there are surely possible constructions of the statement which would encompass more or less immediate and continuing action against the harassed police. They should not be rejected out of hand because of an unexplained preference for other acceptable alternatives.

The simple explanation for the result in this case is that the majority has interpreted the evidence differently from the courts below. In doing so, however, I believe the Court has exceeded the proper scope of our review. Rather than considering the "evidence" in the light most

favorable to the appellee and resolving credibility questions against the appellant, as many of our cases have required,* the Court has instead fashioned its own version of events from a paper record, some "uncontroverted evidence," and a large measure of conjecture. Since this is not the traditional function of any appellate court, and is surely not a wise or proper use of the authority of this Court, I dissent.

---

*See, e. g., Glasser v. United States, 315 U. S. 60, 80 (1942).