WILLIAM V. YAKUBOWICZ, administrator,[1] vs. PARAMOUNT
PICTURES CORPORATION & another.[2]

Middlesex.  December 8, 1988. — April 18, 1989.

Present: HENNESSEY, C.J., ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Practice, Civil*, Summary judgment. *Negligence*, Wrongful death, Duty to
warn, Theatre. *Constitutional Law*, Freedom of speech and press. *Motion
Picture. Alcoholic Liquors*, Theatre.

Motion picture producers and theatre operators owe a duty of reasonable
care to members of the public with respect to the producing, exhibiting
and advertising of movies. [629-630]
The plaintiff in a civil action did not demonstrate that the defendants, a mo-
tion picture producer and the operator of a movie theatre, violated their
duty of reasonable care to members of the public with respect to the
creation and exhibition of a certain film, "The Warriors," which was
an exercise of free speech protected by the First Amendment to the
United States Constitution and art. 16 of the Massachusetts Declaration
of Rights. [630]
This court determined that nothing in a certain motion picture, "The War-
riors," constituted "incitement" unprotected by constitutional guarantees
of freedom of speech. [630-632]
A fatal assault committed by a theatre patron several miles from the theatre at
which, a short time earlier, he had viewed a certain film, could not, as
matter of law, be attributed to an alleged failure by the producer of the
film to "protect [people] at or near the theatre" or to warn the theatre
operator or public officials of the dangers of film-related violence.
[632]
A motion picture theatre that did not serve or supply alcoholic beverages, but
whose premises were used by a patron for the illicit consumption of
alcohol, did not owe members of the general public miles from the
theatre any duty to protect them from acts resulting from the patron's
self-induced intoxication. [632-633]

CIVIL ACTION commenced in the Superior Court Department
on December 29, 1981.

[1] Of the estate of Martin Yakubowicz.

[2] Saxon Theatre Corporation.

Motions for summary judgment were heard by *J. Harold Flannery*, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Elizabeth N. Mulvey* for the plaintiff.

*David W. Rosenberg* for Paramount Pictures Corporation.

*James S. Dittmar* (*Gordon P. Katz, Rhonda L. Russian & Joseph H. Caffrey* with him) for Saxon Theatre Corporation.

O'CONNOR, J. The plaintiff, William Yakubowicz, administrator of the estate of his son, Martin Yakubowicz, appeals from an order of the Superior Court granting summary judgment to the defendants, Paramount Pictures Corporation (Paramount) and Saxon Theatre Corporation (Saxon), on a complaint seeking damages for wrongful death under G. L. c. 229, § 2 (1986 ed.). The complaint alleges that sixteen year old Martin Yakubowicz died from a knife wound intentionally inflicted on February 15, 1979, by Michael Barrett, who was returning from a theatre in Boston operated by Saxon, after viewing the motion picture, "The Warriors," which was produced and distributed by Paramount. The complaint alleges that both defendants knew of violence and threats of violence perpetrated by members of "gangs" attending showings of the film in Boston and in California, and that Martin Yakubowicz's death was causally related to the defendants' exhibition of the film to Michael Barrett.

Specifically, count one alleges that Paramount produced, distributed, and advertised "The Warriors" in such a way as to induce film viewers to commit violence in imitation of the violence in the film. Counts two and four allege that Paramount and Saxon caused the decedent's death by continuing to exhibit the film after learning of "an unprecedented series of lawless violent acts" at or near theatres showing the film. Count three charges Paramount with failure to warn exhibitors and public authorities of the danger of violence, and "failure to take reasonable steps to protect [persons] at or near the theatre." Count five alleges that Michael Barrett consumed alcohol while viewing "The Warriors," and left the theatre in an intoxicated state, and charges Saxon with failing to exercise proper supervision and control over its patrons.

Both defendants moved for summary judgment, arguing that, as a matter of law, they owed no duty to the decedent, and that the First Amendment to the United States Constitution and art. 16 of the Declaration of Rights of the Massachusetts Constitution, as amended by art. 77 of the Amendments, bar liability for their exhibition of the film. The judge who ruled on the motions for summary judgment noted that the "decedent was neither a patron nor within the proximity of the Saxon Theatre at the time of the incident," and that Saxon did not supply Barrett with any alcoholic beverages. He concluded that there was no "special relationship" between the plaintiff's decedent and either defendant and that therefore the defendants owed no duty to the plaintiff's decedent. Accordingly, the judge granted the defendants' motion without reaching the constitutional question. We affirm the summary judgment order, although our reasoning differs from that of the judge.

"Rule 56 (c) of the Massachusetts Rules of Civil Procedure, 365 Mass. 824 (1974), provides that summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' 'The party moving for summary judgment assumes the burden of affirmatively demonstrating that there is no genuine issue of material fact on every relevant issue, even if he would have no burden on an issue if the case were to go to trial.' *Pederson* v. *Time, Inc., ante* 14, 17 (1989). *Attorney Gen.* v. *Bailey*, 386 Mass. 367, 371, cert. denied sub nom. *Bailey* v. *Bellotti*, 459 U.S. 970 (1982)." *Leavitt* v. *Mizner, ante* 81, 88 (1989). Accordingly, we look at the materials available to the judge for summary judgment purposes in the light most favorable to the plaintiff to see whether, as a matter of law, they support a claim for wrongful death.

The materials submitted to the motion judge present the following facts. "The Warriors" is a motion picture produced, distributed, marketed, and advertised by Paramount. The film includes numerous scenes of juvenile gang-related violence in which youths battle with knives, guns, and other weapons as

they pursue one gang, the "Warriors," through the subways of New York City. Advertising for the film depicted menacing youths wielding baseball bats. The film opened at the Saxon Theatre on February 9, 1979. Paramount executives scheduled the film for release in Massachusetts during February school vacation week in order to maximize attendance by high school-aged patrons.

On February 12, 1979, two youths were killed near theatres showing "The Warriors" in Palm Springs and Oxnard, California.[3] Paramount officials were aware of claims that the Palm Springs killing was related to the viewing of the film, "The Warriors." On February 13, 1979, Frank Mancuso, a Paramount employee in charge of film distribution throughout the United States, distributed a telegram to his district and branch managers ordering them to advise each theatre showing "The Warriors" to hire security guards. The telegram stated that "there have been incidents of violence at theatres that might have been prevented with proper security and crowd control." Paramount offered to pay for the extra security. Saxon, in a letter to Paramount dated February 15, 1979, accepted the offer of reimbursement for extra security and also reported a problem of vandalism at showings of "The Warriors."

On the evening of February 15, 1979, Michael Barrett and two friends went to see "The Warriors" at the Saxon Theatre on Tremont Street in Boston. Before arriving at the theatre, Barrett and one of his friends purchased liquor. Barrett's friend hid liquor bottles in the pockets of his jacket, and also poured a bottle of whiskey into a half-empty soft drink container. On the way into the theatre, an employee stopped Barrett, who was carrying the container. Barrett said to the theatre employee, "Want to smell it? It's only Coke," and the employee let him into the theatre with the container. This violated a Saxon policy

---

[3] The plaintiff states "[u]pon information and belief" that these youths were killed "by persons who just had seen" "The Warriors." The plaintiff's brief supports this statement by citing the transcript of a news report; however, this news report does not in fact state whether the assailants had seen the motion picture.

against admitting patrons carrying alcoholic beverages or bottles of any kind. Once inside the theatre, Barrett began drinking, in violation of Saxon's policy against consuming alcohol on the premises. Saxon did not have a license for the sale or distribution of alcoholic beverages, and Saxon employees did not provide Barrett with any alcohol. Barrett and his friends sat through two showings of the movie. Barrett became so intoxicated that he vomited and passed out at the theatre during the second showing. After the movie, Barrett and his friends left the theatre and headed back to Dorchester by way of the Park Street subway station.

Another group of Dorchester teenagers, including Dino Troila, attended the same showing of "The Warriors" and also headed home by way of the Park Street station. There was a history of arguments and "tension" between this group and the group of youths that Barrett "hung out" with. While the teenagers were waiting for the train, the decedent came onto the platform. He had not been to see "The Warriors," but had been at work at a ski shop on Boylston Street. The decedent was friendly with Troila and got on the train with that group. Barrett and his friends boarded the same car.

As the train approached the Fields Corner subway station in Dorchester, Barrett's friend, Mark Rogers, approached Troila and tried to arrange a fight "one on one" between the decedent and Barrett. Barrett also began yelling at the decedent and challenging him to fight. Barrett referred to a fight that had occurred several months earlier between Barrett and some friends of the decedent. The decedent was not present at that earlier fight. Barrett said to the decedent, "I want you, I'm going to get you," purportedly in imitation of a scene from "The Warriors." The decedent repeatedly told Barrett that he did not want to fight.

Both groups left the subway at the Fields Corner station. As the decedent passed through the turnstyle area, Barrett, who was still drunk, jumped on him and began to fight. Troila and Rogers also became involved in the altercation. Barrett pulled a knife and stabbed the decedent in the chest. The decedent died the following morning.

On February 16, 1979, the day following the stabbing, Frank Mancuso, on behalf of Paramount, distributed a telegram offering to release theatre owners from their contractual obligations to show "The Warriors." The telegram stated: "It has come to our attention through newspaper and television reports that acts of violence and vandalism have occurred in and around theatres exhibiting THE WARRIORS. . . . Please be advised that in the event you believe that the exhibition of this motion picture in your theatre poses a risk to persons or property, then Paramount will relieve you of your obligation to exhibit the picture . . . ." The telegram also stated that Paramount was cancelling all Paramount supported advertising for "The Warriors." This was the first time that Paramount ever took such action. Saxon received this telegram, but continued to exhibit "The Warriors" daily through April 5, 1979.

Counts one through four of the complaint allege, in essence, that Paramount was negligent in the way it produced, distributed, advertised, and exhibited the film, "The Warriors," and that Saxon was negligent in its continued exhibition of the film, and that the defendants' negligence proximately caused the death of the plaintiff's decedent.

"There can be negligence only where there is a duty to be careful," *Theriault* v. *Pierce*, 307 Mass. 532, 533 (1940), and whether there is a duty to be careful is a question of law. *Monadnock Display Fireworks, Inc.* v. *Andover*, 388 Mass. 153, 156 (1983). In determining whether the law ought to provide that a duty of care is owed by one person to another, we look to existing social values and customs, and to appropriate social policy. *Schofield* v. *Merrill*, 386 Mass. 244, 246-254 (1982). A basic principle of negligence law is that ordinarily everyone has a duty to refrain from affirmative acts that unreasonably expose others to a risk of harm. Thus, we have held that a keeper of a tavern owes to travelers on the highway a duty of care with respect to the furnishing of alcoholic beverages to his customers, *Cimino* v. *Milford Keg, Inc.*, 385 Mass. 323, 327 (1982); *Adamian* v. *Three Sons, Inc.*, 353 Mass. 498 (1968), and the proprietor of a liquor store owes a duty of care to the public which may be violated by selling liquor

to minors, *Michnik-Zilberman* v. *Gordon's Liquor, Inc.*, 390 Mass. 6, 10-12 (1983). In keeping with that principle, Paramount and Saxon owed a duty of reasonable care to members of the public including the plaintiff's decedent with respect to the producing, exhibiting, and advertising of movies.

The next question is whether there is a genuine issue with respect to whether that duty was violated. With reference to counts one, two, and four of the plaintiff's complaint alleging negligence in the creation and exhibition of "The Warriors," we conclude that, as a matter of law, the defendants did not violate their duty of reasonable care. This conclusion follows from the First and Fourteenth Amendments to the United States Constitution and art. 16. "Motion pictures are a significant medium for the communication of ideas." *Joseph Burstyn, Inc.* v. *Wilson*, 342 U.S. 495, 501 (1952). They are protected by the First Amendment just like other forms of expression. *Id.* at 502. It is immaterial for First Amendment purposes whether speech is suppressed under the criminal law or by "penalties" imposed by tort law. See *New York Times Co.* v. *Sullivan*, 376 U.S. 254, 277 (1964) ("What a State may not constitutionally bring about by means of a criminal statute is likewise beyond the reach of its civil law of libel"). Although freedom of speech is not absolute, and liability may exist for tortious conduct in the form of speech, see *Weirum* v. *RKO Gen., Inc.*, 15 Cal. 3d 40 (1975), the recognized exceptions to First Amendment protection are narrowly defined and, as we discuss below, do not reach "The Warriors." We conclude that the defendants could not properly be found to have violated their duty of reasonable care by exercising protected rights of free speech.[4]

The plaintiff contends that "The Warriors" falls within the "incitement" exception to First Amendment protection. This exception applies to speech which advocates "the use of force or of law violation . . . where such advocacy is directed to inciting or producing imminent lawless action and is likely to

---

[4] In any event, the defendants cannot be liable for exercising those rights. See *New York Times Co.* v. *Sullivan, supra* at 283.

incite or produce such action." *Brandenburg* v. *Ohio*, 395 U.S. 444, 447 (1969). But speech does not lose its First Amendment protection merely because it has "a tendency to lead to violence." *Hess* v. *Indiana*, 414 U.S. 105, 109 (1973).

A copy of the film has been made available as part of the record on summary judgment. The undisputed affidavit of Alfred F. LoPresti, a Paramount senior vice president, asserts that this copy is identical to the one exhibited to Barrett at the Saxon Theatre. We treat as a question of law whether this film constitutes "incitement" for First Amendment purposes. *De-Filippo* v. *NBC*, 446 A.2d 1036, 1041 (R.I. 1982). Although that determination is essentially a factual one, it is our responsibility to decide it incidental to our legal determination whether the movie is protected by the First Amendment. See *Bose Corp.* v. *Consumers Union of U.S., Inc.*, 466 U.S. 485, 505-506 (1984); *New York Times Co.* v. *Sullivan, supra* at 285.

Based on our viewing of the film, we conclude that nothing in it constitutes unprotected incitement. "The Warriors" is a work of fiction portraying the adventures of one New York City youth gang being pursued through territory controlled by hostile gangs. Although the film is rife with violent scenes, it does not at any point exhort, urge, entreat, solicit, or overtly advocate or encourage unlawful or violent activity on the part of viewers. It does not create the likelihood of inciting or producing "imminent lawless action" that would strip the film of First Amendment protection. *Brandenburg* v. *Ohio, supra.* The movie does not "purport to order or command anyone to any concrete action at any specific time, much less immediately." *McCollum* v. *CBS, Inc.*, 202 Cal. App. 3d 989, 1001 (1988). See *Olivia N.* v. *NBC*, 126 Cal. App. 3d 488, 496 (1981), discussing *Weirum* v. *RKO Gen., Inc.*, 15 Cal. 3d 40 (1975). Therefore, we hold that the defendant Paramount did not act unreasonably in producing, distributing, and exhibiting "The Warriors," because such expression is protected by the First Amendment. Accordingly, Saxon, too, did not act unreasonably in exhibiting "The Warriors." "[I]t is simply not acceptable to a free and democratic society . . . to limit and

restrict . . . creativity in order to avoid the dissemination of ideas in artistic speech which may adversely affect emotionally troubled individuals." *McCollum* v. *CBS, Inc.*, *supra* at 1005-1006. We thus conclude that summary judgment for the defendants is proper on counts one, two, and four.

Count three of the complaint alleges that Paramount failed to take reasonable steps "to warn the exhibitors of the film and those responsible for the safety of the public" and "to take reasonable steps to protect [people] at or near the theatre." The judge correctly ordered summary judgment for Paramount on count three. A fatal assault occurring miles from the theatre as a matter of law could not be attributed to a failure to "protect [people] at or near the theatre" or a failure to warn Saxon or public officials of the dangers of film-related violence.

Count five of the complaint rests on the assertion that Saxon failed to exercise proper supervision and control over its patrons in that it permitted Barrett "to consume excessive amounts of alcoholic beverages and other intoxicants while viewing *The Warriors*," and that, while under the influence of these intoxicants, Barrett killed the decedent. The judge properly entered summary judgment for Saxon on this count on the ground that Saxon did not owe the decedent a duty to protect him from acts resulting from Barrett's self-induced intoxication. The uncontradicted affidavit of one of the persons accompanying Barrett to the theatre states that, during the showing of the movie, Barrett drank liquor that he and his friends had smuggled into the theatre. The record also contains the uncontradicted affidavit of the former manager of the Saxon Theatre that, on the night in question, Saxon personnel neither sold nor distributed any alcoholic beverages or other intoxicants to theatre patrons. Thus, Saxon's situation was entirely different from the situation of the defendants in *Cimino* v. *Milford Keg, Inc.*, *supra*; *Adamian* v. *Three Sons, Inc. supra*; and *Michnik-Zilberman* v. *Gordon's Liquor, Inc.*; *supra*. We have never imposed tort liability on a defendant whose premises are simply used for the consumption of alcoholic beverages, even with the defendant's knowledge, where the defendant did not serve or

supply the intoxicants. See *Dhimos* v. *Cormier*, 400 Mass. 504 (1987); *Langemann* v. *Davis*, 398 Mass. 166 (1986).

*Judgment affirmed.*