826 So.2d 551 (2002)
Patsy Ann Byers, and Her Husband Lonnie Wayne BYERS, and as Natural Tutor for Jacob Eugene Byers and Joshua Noah Byers
v.
Sarah EDMONDSON, Benjamin Darrus, James E. Edmondson, Suzanne Edmondson, USAA Casualty Company, et al.
No. 2001 CA 1184.
Court of Appeal of Louisiana, First Circuit.
June 5, 2002.
Writ Denied October 4, 2002.
*552 Joseph Simpson, Amite, Rick A. Caballero, Baton Rouge, Ron Macaluso, Hammond, for Plaintiffs/Appellants, Patsy Ann Byers, et al.
Timothy G. Schafer, New Orleans, for Defendants/Appellees, James and Suzanne Edmondson.
*553 Alton B. Lewis, Hammond, Walter E. Dellinger, David E. Wood, Los Angeles, CA, for Defendants/Appellees, Time Warner Entertainment Company, Et Al.
Before: CARTER, C.J., PARRO, and CLAIBORNE,[1] JJ.
CARTER, C.J.
This is an appeal of a judgment dismissing the director and producers of the film, Natural Born Killers, from a lawsuit filed by plaintiffs, who claimed the film incited the incident wherein one of the plaintiffs was physically injured.

FACTS AND PROCEDURAL HISTORY
On March 8, 1995, Patsy Byers was shot during an armed robbery of a convenience store where she worked in Ponchatoula, Louisiana. As a result of the shooting, Patsy Byers was rendered a paraplegic. The perpetrator of this armed robbery was Sarah Edmondson, who, along with her boyfriend, Benjamin Darrus, set out from Oklahoma originally intending to attend a Grateful Dead concert in Memphis, Tennessee. Tragically, within three days of leaving Oklahoma, Darrus had murdered William Savage during the course of an armed robbery in Mississippi, and Edmondson had shot Byers. See State v. Edmondson, 97-2456, p.2 (La.7/8/98), 714 So.2d 1233, 1235. Whether Natural Born Killers incited Edmondson and Darrus to commit their horrific and senseless crimes and whether this action seeking damages from the director and producers of the film can proceed is the subject of this appeal.
Edmondson and Darrus did not return to Oklahoma for several weeks following the Byers shooting. There is no indication that they engaged in any other violent crimes. Edmondson and Darrus were eventually implicated in the Byers shooting. Edmondson gave a statement to the authorities wherein she revealed that the night before they left for Memphis, she and Darrus spent the night at a cabin owned by her family in Welling, Oklahoma. It was there that they watched Natural Born Killers.[2] In Edmondson's initial statement given to police, she commented that "Ben really loved this movie."
On July 26, 1995, Byers filed suit against Edmondson and Darrus seeking damages for the injuries she sustained as a result of the shooting.[3] Byers amended her petition *554 several times adding additional defendants. Included in the additional defendants are Time Warner Entertainment Company, L.P., Alcor Film & TV, GMBH & Co. Produktions KG, Jane and Don Productions, Inc., and Oliver Stone (hereinafter collectively referred to as the Stone/Warner defendants). Byers alleged that Edmondson and Darrus embarked on a crime spree that culminated in the shooting of Pasty Byers as a result of seeing and becoming inspired by the movie Natural Born Killers, which was produced, directed, and distributed by the Stone/Warner defendants.
The Stone/Warner defendants previously attempted to dismiss the actions against them by filing a peremptory exception raising the objection of no cause of action on the basis that the film was protected speech under the First Amendment of the United States Constitution.[4] Although the trial court granted this exception, this court overruled that decision and found that Byers had indeed stated a cause of action against these defendants. Byers v. Edmondson, 97-0831 (La.App. 1st Cir.5/15/98), 712 So.2d 681, 689, writ denied, 98-1596 (La.10/9/98), 726 So.2d 29, cert. denied, sub nom Time Warner Entertainment Co., L.P. v. Byers, 526 U.S. 1005, 119 S.Ct. 1143, 143 L.Ed.2d 210 (1999) (Byers I).
In the procedural posture of Byers I, this court was bound to accept the allegations of Byers' petition as true. Following an examination of Byers' petition, we found that, because Byers had alleged that these defendants produced and released a film containing violent imagery that was intended to cause viewers to imitate the violent imagery, the petition stated a cause of action under Louisiana law and made sufficient allegations to remove the film from First Amendment protection on the basis that it incited imminent lawless activity.[5] The substantive issue of whether Natural Born Killers is protected speech under the First Amendment was not addressed in Byers I.
The Stone/Warner defendants filed a motion for summary judgment seeking dismissal of this action on the basis that they were entitled to judgment as a matter of law according to Louisiana tort law, Louisiana constitutional law, and United States constitutional law. In our review of the trial court's granting of summary judgment,[6] the central issue is whether Natural Born Killers is protected speech under the First Amendment.

DISCUSSION
The First Amendment to the Constitution of the United States provides:
Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.
*555 Motion pictures are a significant medium for the communication of ideas and, like other forms of expression, are protected by the First Amendment. Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 501-02, 72 S.Ct. 777, 780-81, 96 L.Ed. 1098 (1952). The fact that a case does not involve government restriction of speech does not prevent the barring of an action that violates the First Amendment. The chilling effect of permitting the imposition of civil liability based on negligence is obvious the fear of damage awards may be markedly more inhibiting than the fear of prosecution under a criminal statute. New York Times Co. v. Sullivan, 376 U.S. 254, 277, 84 S.Ct. 710, 724, 11 L.Ed.2d 686 (1964).
The First Amendment guarantee of freedom of speech is not without some carefully considered limitations. The United States Supreme Court has stated that the "unconditional phrasing of the First Amendment was not intended to protect every utterance." Roth v. United States, 354 U.S. 476, 483, 77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498 (1957). As one scholar has noted, "Freedom of communication under the Constitution ends when it begins to disturb the peace." Chester James Antieau, Modern Constitutional Law (2nd ed.1997) § 1.03, p.7, citing Joseph Story, Commentaries on the Constitution (1st ed., Boston, 1933) vol. III, pp. 732-33. There are four categories of speech that do not receive any constitutional protection: (1) obscene speech, Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973); (2) defamatory invasions of privacy, Beauharnais v. Illinios, 343 U.S. 250, 72 S.Ct. 725, 96 L.Ed. 919 (1952); (3) fighting words, Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942); and (4) words likely to produce imminent lawless action (incitement), Brandenburg v. Ohio, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) (per curiam).
Byers alleges that Natural Born Killers is not entitled to First Amendment protection because it is inciteful and obscene. The inquiry into the protected status of speech is one of law, not fact. Connick v. Myers, 461 U.S. 138, 148 n. 7, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983); see also, DeFilippo v. National Broadcasting Co., Inc., 446 A.2d 1036, 1041 (R.I.1982), and Yakubowicz v. Paramount Pictures Corp., 404 Mass. 624, 630-32, 536 N.E.2d 1067, 1071-72 (Mass.1989) (wherein the courts determined whether a film constituted "incitement" for First Amendment purposes as a matter of law). Accordingly, the central issue of this appeal is whether Natural Born Killers loses its First Amendment protection because of its content. A copy of the film is in the record, and Oliver Stone, the director of Natural Born Killers, certified through his affidavit that this copy is in the same form in which it was released to the public in 1994 in theaters and later on videocassettes. Because we are bound to determine as a matter of law whether the film is protected speech, this is a proper determination under a motion for summary judgment. See LSA-C.C.P. art. 966(B) and (C); see also O'Neal v. Blackwell, 00-2014 (La.App. 1st Cir.11/14/01), 818 So.2d 118, 120.

Incitement
To justify a claim that speech should be restrained or punished because it is or was an incitement to lawless action, the court must be satisfied that the speech (1) was directed or intended toward the goal of producing imminent lawless conduct and (2) was likely to produce such imminent conduct. Speech directed to action at some indefinite time in the future will not satisfy this test. Moreover, speech does not lose its First Amendment *556 protection merely because it has a tendency to lead to violence. Hess v. Indiana, 414 U.S. 105, 108-09, 94 S.Ct. 326, 328-29, 38 L.Ed.2d 303 (1973).
This court is aware that, because of the abundance of imagery used in the film, there is certainly room for a wide variety of interpretations. It is not the prerogative of this court to provide an allegorical interpretation of this movie or to provide an artistic critique. Based on our viewing of the film, we conclude that nothing in it constitutes incitement. Natural Born Killers is not just about the killing spree of its main characters, Mickey and Mallory Knox, but also portrays how their exploits are glorified by the media to the point where they become cultural icons. The basic plot of the movie follows Mickey and Mallory as they meet, murder her abusive parents, and then engage in a killing spree. It also chronicles their capture, imprisonment, and Mickey's interview with a tabloid journalist that causes a prison riot facilitating their escape.
Throughout the film, images frequently switch from color to black and white, and even live-action video. Some of the scenes employ facial distortions, sitcom laugh tracks, newspaper and cartoon clips, slow motion and oblique camera angles. Such techniques place this film in the realm of fantasy. Natural Born Killers is permeated with violent imagery, which goes to the core of the issue. The violence in the film is presented in the format of imagery and fictionalized violence. Although we acknowledge that such a portrayal of violence can be viewed as a glorification and glamorization of such actions, such a portrayal does not rise to the level of incitement, such that it removes the film from First Amendment protection.
When considering the guidelines that courts have used in determining whether speech is classified as inciteful, we cannot say that Natural Born Killers exhorts, urges, entreats, solicits, or overtly advocates or encourages unlawful or violent activity on the part of viewers. See Yakubowicz, 404 Mass. at 631, 536 N.E.2d at 1071. Natural Born Killers does not purport to order or command anyone to perform any concrete action immediately or at any specific time. See McCollum v. CBS, Inc., 202 Cal.App.3d 989, 1001, 249 Cal. Rptr. 187 (1988). Nor do we find this film promotes crime in concrete, non-abstract terms. Cf. Rice v. Paladin Enterprises, Inc., 128 F.3d 233, 254-56 (4th Cir.1997), cert. denied, 523 U.S. 1074, 118 S.Ct. 1515, 140 L.Ed.2d 668 (1998). At no point during this film is the viewer directed or urged to commit any type of imminent lawless activity.
As we note, Byers alleges that Edmondson and Darrus became inspired by what was shown in Natural Born Killers. The concept of "copycat" actions has been addressed in Rice v. Paladin Enterprises, Inc., 128 F.3d at 266, wherein the United States Fourth Circuit Court of Appeals commented,
[I]n virtually every "copycat" case, there will be lacking in the speech itself any basis for a permissible inference that the "speaker" intended to assist and facilitate the criminal conduct described or depicted. Of course, with few, if any, exceptions, the speech which gives rise to the copycat crime will not directly and affirmatively promote the criminal conduct, even if, in some circumstances, it incidentally glamorizes and thereby indirectly promotes such conduct. (Emphasis ours).
After viewing Natural Born Killers, we are convinced that the present case presents such a copycat scenario. We are mindful of the United States Supreme Court's guideline that speech does not lose its First Amendment protection merely because *557 it has "a tendency to lead to violence." Hess v. Indiana, 414 U.S. at 109, 94 S.Ct. 326. Edmondson and Darrus may very well have been inspired to imitate the actions of Mickey and Mallory Knox, but the film does not direct or encourage them to take such actions. Accordingly, as a matter of law, we find Natural Born Killers cannot be considered inciteful speech that would remove it from First Amendment protection.
Although the plaintiffs have gone to great lengths in attempting to demonstrate the particular intent of the defendants, particularly the intent of Oliver Stone in creating Natural Born Killers, such a determination is not essential to the disposition of this matter. The allegations in Byers' petition alleged that the Stone/Warner defendants are liable as a result of their misfeasance in that they produced and released a film containing violent imagery which was intended to cause viewers to imitate the violent imagery. We find as a matter of law that Natural Born Killers is not inciteful speech. Therefore, the intent of the Stone/Warner defendants is not material, since Natural Born Killers is not inciteful speech.[7]

Obscenity
To constitute obscenity, there must be independent proof of the following factors: (1) the average person, applying contemporary community standards, would find that the work, taken as a whole, appeals to the prurient interest; (2) measured by contemporary community standards, the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by applicable state law; and (3) the work, taken as a whole, lacks serious literary, artistic, political or scientific value. Miller v. California, 413 U.S. at 25, 93 S.Ct. 2607.
Byers does not allege that Natural Born Killers meets the Miller criteria for obscenity; rather Byers argues that "[t]here is no reason why senselessly violent speech like [Natural Born Killers ] cannot also be labeled as obscene, as it does precisely the same thing." The Louisiana Supreme Court has previously recognized that the First Amendment does not permit a violence-based notion of obscenity. State v. Johnson, 343 So.2d 705, 709-10 (La.1977). Accordingly, we decline to extend the obscenity exception to the First Amendment to cover the violence of Natural Born Killers.

CONCLUSION
It is an unfortunate aspect of our society that certain individuals seek to emulate fictional representations. However, the constitutional protection accorded to the freedom of speech and of the press is not based on the naive belief that speech can do no harm, but on the confidence that the benefits society reaps from the free flow and exchange of ideas outweigh the costs society endures by receiving reprehensible or dangerous ideas. Herceg v. Hustler Magazine, Inc., 814 F.2d 1017, 1019 (5th Cir.1987). Edmondson's and Darrus' decision to imitate the characters of a film is more a regrettable commentary on their own culpability, than a danger of free expression requiring courts to chill such speech through civil penalties. Because we find as a matter of law that the film Natural Born Killers is protected by the First Amendment, an action seeking civil damages based on the effect of the film cannot be sustained. The decision of the *558 trial court granting the summary judgment and dismissing Time Warner Entertainment Company, L.P., Alcor Film & TV, GMBH & Co. Produktions KG, Jane and Don Productions, Inc., and Oliver Stone is affirmed. All costs of this appeal are assessed to the plaintiffs, the estate of Pasty Byers, Lonnie Wayne Byers, individually, and as natural tutrix for Jacob Eugene Byers, and Joshua Noah Byers.
AFFIRMED.
NOTES
[1] Hon. Ian W. Claiborne, retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] Following the commencement of this litigation, Edmondson executed an affidavit that stated:

During the two weeks prior to the robbery and shooting of Mr. Savage on March 7, 1995 and the robbery and shooting of Mrs. Byers on March 8, 1995, Benjamin Darrus [and] I watched Natural Born Killers several time[s] in Oklahoma. We also ingested a quantity of LSD, a hallucinogen, during this time. Had we not seen the movie repeatedly we would not have taken a gun. It wouldn't have occurred to me. As well, had we not been under the influence of LSD; we never would have left Oklahoma.
The movie did have a numbing influence concerning the effects of violence and a desire to experience it. The shooting did not take place as much from a need for money as from a desire to experience the power of violence. Benjamin had told me before leaving while watching the film that I was "his Mallory," and during the trip I quoted, "I'm a new woman."
The effect the movie had on us is a factor. It is one of several elements all-contributing to a dangerous chemistry with roots in very bad choices.
[3] Although the original petition was filed on behalf of Byers, her husband, and their three children, during the process of this litigation, Mrs. Byers died. Mrs. Byers' estate has been substituted as a plaintiff. For purposes of this appeal, the plaintiffs will collectively be referred to as Byers.
[4] The free speech guarantees contained in the First Amendment are the same free speech guarantees contained in Article I, § 7 of the Louisiana Constitution of 1974. These two provisions will collectively be referred to as the First Amendment.
[5] Byers also alleged that the film fell in the obscenity exception, but this court did not address the allegation.
[6] In its oral reasons for judgment, the trial court noted the agreement of counsel that the judgment be certified as final, and the court so certified it. At oral argument before this court, counsel confirmed the certification.
[7] In reaching this conclusion, we note that in all the jurisprudence where a court was confronted with the question of whether certain speech was protected by the First Amendment, the paramount consideration involved an examination of the speech itself.