Kirpalani, Maynard M., J.
INTRODUCTION
This action arises out of the selection and subsequent removal of the plaintiff, Jeffrey Scheman, as head coach of his son’s youth basketball team by the defendants, Hopkinton Basketball Association, Inc. (“HBA”) and its board members, Fritz Rudden, Steve Grosso, Dan Sullivan, Katie Yankosek, Mike Preite, Mary Korbey, and Jerrie Bernier-Chandler (“Board Members” or “Board”) (collectively, “Defendants”). Scheman filed suit against the Defendants on November 23, 2011. His First Amended Complaint, filed April 23, 2012, asserts claims for gross negligence, intentional and/or grossly negligent infliction of emotional distress, and defamation. The matter is before the court on the Defendants’ Motion to Dismiss. For the reasons that follow, the Defendants’ motion is ALLOWED in part and DENIED in part.
BACKGROUND
Scheman alleges the following facts in his First Amended Complaint.
The HBA is an incorporated association which operates youth basketball teams and programs in Hopkinton. For the last three seasons (2008-2009, 2009-2010, 2010-2011), Scheman has coached his son’s HBA travel basketball teams. After confirming that Scheman had no Criminal Offender Record Information (“CORI”) issues, the HBA selected Scheman as head coach of the 7th grade boys “A” team for 2011-2012. On October 7, 2011, the HBA notified Scheman of his team’s roster by email and directed him to contact the players and their parents on the night of October 10th. Scheman did as he was directed and began planning for the season.
On the same day as the HBA notified Scheman that he would be the head coach, Board Members Rudden, Grosso, and Preite received a coaching application from another parent, Don Wolfe. Within a matter of days and before a single team game or practice, six of the seven Board Members — Rudden, Grosso, Sullivan, Yancosek, Preite, and Korbey — held a meeting on October 18, 2011. At the meeting, the Board allegedly heard complaints about Scheman’s coaching style from two parents who did not have a child on Scheman’s team and received an email from a parent from another town. Although many, if not all, of the Board Members were aware of Scheman’s coaching style when they selected him, they decided to immediately remove Scheman from the league without either communicating with any of the parents whose children were actually on Scheman’s team or assessing whether those individuals who had made complaints had ulterior motives for doing so, which they did. The Board then appointed Don Wolfe as the new head coach.
On October 19th, five Members of the Board— Rudden, Sullivan, Yancosek, Preite, and Korbey — met with Scheman. They treated him with hostility and contempt, and as if he had done something wrong. After Rudden informed Scheman that he would no longer be the head coach, he told Scheman, and the rest of the Board agreed, that it would be best if Scheman told the team that he had resigned due to the demands of his business. Scheman refused. Rudden then told Scheman that he had wasted enough of the Board’s time and instructed him to leave the meeting.
The next morning, the Board apprised team parents of the coaching change in a one-line email, which contained no explanation as to why Scheman had been removed. Over the following days, a number of parents of past and current players contacted the Board Members pleading for a meeting and asking what Scheman had done wrong and whether their children were in danger. Scheman’s wife also emailed the Board Members, stating that because of *90 Scheman’s abrupt and unexplained termination, people in the community thought that Scheman had done something improper or wrong. She requested that an explanation be provided to the Scheman family and to team parents.
Rather than provide the parents who had inquired with the reasons for Scheman’s removal, the Board sent the following email:
Dear Parent,
The information reviewed by this board is both extensive and confidential and warranted the steps taken. The timing was unavoidable and our decision was given as quickly as the circumstances permitted. Two volunteers will be coaching this team and we expect the players to have a wonderful season.
Respectfully,
The HBA Board
On the night of October 22nd, after Don Wolfe sent an email demanding that parents confirm their children’s continued participation on the team, eight sets of parents sent a group email to all of the Board Members requesting a meeting to discuss Scheman’s removal. When the Board did not respond, several team parents emailed the Board Members out of concern that Scheman presented a threat to their children’s safely or had engaged in some type of illegal, unethical, or egregious behavior.
On the morning of October 23rd, the Board Members openly discussed via email how to respond to parents. They believed that the child safety concerns expressed by the parents were merely a ploy to obtain Scheman’s reinstatement as head coach. They ultimately sent a final email to the entire team as follows:
Dear Parents,
As referenced in previous correspondence . . . due to the nature of the situation ALL the information must remain confidential and we cannot discuss any specifics and/or any criteria related to our decision to make the coaching change. We have read all of your emails but the board’s decision is final and we will not be conducting any additional meetings to discuss the situation.
Respectfully,
The HBA Board
On the night of October 23rd, after receiving the Board’s email, one of the team parents responded: “Since you won’t tell the parents of the team what the reason was for your decision the community is concerned that you are aware of something that would endanger our children.” The email requested that the Board Members simply inform parents whether they should be concerned for the safety of their children. The Board Members refused to respond.
The next day, October 24th, the Board became aware that children at school were teasing Scheman’s son and calling his father a “child molester.” The Board Members continued to stay silent, however, believing that Scheman had brought the situation upon himself because he had not told the team that he had resigned.
Within days of these communications, national news was dominated by the Penn State football scandal in which team and school officials allegedly covered up horrific child sex crimes committed by a member of the coaching staff. Still, the Board Members refused to address parental concerns over whether Scheman posed a threat to child safety or had done something unethical, illegal, or egregious.
As a result of the Board Members’ acts and omissions, Scheman has suffered, among other things: public embarrassment, humiliation and shame, damage to his reputation and standing in the community, severe depression and anxiety, inability to eat, sleep, or perform his job effectively, and other pain and suffering.
DISCUSSION
A motion to dismiss for failure to state a claim permits “prompt resolution of a case where the allegations in the complaint clearly demonstrate that the plaintiffs claim is legally insufficient.” Harvard Crimson, Inc. v. President & Fellows of Harvard Coll., 445 Mass. 745, 748 (2006). In June 2008, the Supreme Judicial Court adopted the United States Supreme Court’s refined standard for evaluating the adequacy of a civil complaint upon a challenge for failure to state a claim: “While a complaint attacked by a . . . motion to dismiss does not need detailed factual allegations ... a plaintiffs obligation to provide the ‘grounds’ of his ‘entitle[ment] to relief requires more than labels and conclusions . . . Factual allegations must be enough to raise a right to relief above the speculative level . . . [based] on the assumption that all the allegations in the complaint are true (even if doubtful in fact) . . .” (alteration in original) (internal, quotation marks omitted). Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2008), quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). “What is required at the pleading stage are factual ‘allegations plausibly suggesting (not merely be consistent with)’ an entitlement to relief.” Id., quoting Bell Atl Corp., 550 U.S. at 557.
I. Gross Negligence
“Gross negligence is substantially and appreciably higher in magnitude than ordinary negligence ... It amounts to indifference to present legal duty and to utter forgetfulness of legal obligations so far as other persons may be affected.” Davis v. Walent, 16 Mass.App.Ct. 83, 92 (1983), quoting Altman v. Aronson, 231 Mass. 588, 591 (1919). In order to prevail on a claim for ordinary negligence, a plaintiff must show “that the defendant owed the plaintiff a duty of reasonable care, that the defendant breached this duty, *91 that damage resulted, and that there was a causal relation between the breach of the duty and the damage.” Jupin v. Kask, 447 Mass. 141, 146 (2006). Whether the defendant owed the plaintiff a duty of reasonable care is a question of law. Yakubowicz v. Paramount Pictures Corp., 404 Mass. 624, 629 (1989), citing Monadnock Display Fireworks, Inc. v. Andover, 388 Mass. 153, 156 (1983).
“The concept of duly ... is not sacrosanct in itself, but is only an expression of the sum total of . . . considerations of policy which lead the law to say that the plaintiff is entitled to protection ... No better general statement can be made than that the courts will find a duly where, in general, reasonable persons would recognize it and agree that it exists” (internal quotation marks omitted). Jupin, 447 Mass. at 146, quoting Luoni v. Berube, 431 Mass. 729, 735 (2000). “In determining whether the law ought to provide that a duty of care is owed by one person to another,” the court is to “look to existing social values and customs, and to appropriate social policy.” Yakubowicz, 404 Mass. at 629, citing Schofield v. Merrill, 386 Mass. 244, 246-54 (1982). “A basic principle of negligence law is that ordinarily eveiyone has a duty to refrain from affirmative acts that unreasonably expose others to a risk of harm.” Id.
Scheman has not identified any cases in which a Massachusetts court has recognized an independent legal duty on remotely similar facts. As such, and in light of the conceivable applicability of existing tort law to the conduct at issue, this court declines to impose a new duty under the circumstances of this case. Scheman’s claim for gross negligence must be dismissed.[2]
II. Intentional Infliction of Emotional Distress
In order to prevail on a claim for intentional infliction of emotional distress, a plaintiff must show “(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct. . . ; (2) that the conduct was ‘extreme and outrageous,’ was ‘beyond all possible bounds of decency’ and was ‘utterly intolerable in a civilized community’. . . ; (3) that the actions of the defendant were the cause of the plaintiffs distress . . . ; and (4) that the emotional distress sustained by the plaintiff was ‘severe’ (citations omitted)” (internal quotation marks omitted). Howell v. Enterprise Publ’g Co., 455 Mass. 641, 672 (2010), quoting Agis v. Howard Johnson Co., 371 Mass. 140, 144-45 (1976).
“There is an issue for the jury if reasonable people could differ on whether the conduct is ‘extreme and outrageous.’ ” Boyle v. Wenk, 378 Mass. 592, 597 (1979), citing Agis, 371 Mass. at 145-46. “[L]¡ability cannot be predicated upon ‘mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities[.]’ ” Foley v. Polaroid Corp., 400 Mass. 82, 99 (1987), quoting Restatement (Second) of Torts §46, cmt. d (1965). However, “the jury are entitled to draw reasonable inferences from the totality of circumstances.” Boyle, 378 Mass. at 595. For example, “(r)epeated harassment. . . may compound the outrageousness of incidents which, taken individually, might not be sufficiently extreme to warrant liability for infliction of emotional distress.” Id. Moreover, “(c)onduct otherwise reasonable may become tortious when directed at an individual known to be particularly susceptible to infliction of emotional distress.” Id. at 596, citing Restatement (Second) of Torts §46, cmt. f, illustrations 9-11 (1965).
According to the Defendants, Scheman has failed to allege any extreme and outrageous conduct on their parts. In particular, the Defendants argue that, under Richey v. American Auto. Assoc., 380 Mass. 835, 839 (1980), removing Scheman from his coaching position, even if a “bad, unjust, and unkind” decision, does not rise to the level of extreme and outrageous conduct. The Defendants further contend that their refusal to publicly disclose the reasons for the removal does not constitute extreme and outrageous conduct and cite Williams v. Commonwealth Limousine Serv., Inc., 1999 WL 1331281 at *1 (Mass.Super. 1999) (Zobel, J.), and Petsch-Schmid v. Boston Edison Co., 914 F.Sup. 697, 707 (D.Mass. 1996), in support of the proposition that such refusal was arguably necessary to avoid interfering with Scheman’s privacy rights. While the Defendants’ arguments may have merit with respect to discrete acts of the Board, at this point, the court cannot say as a matter of law that no reasonable jury could find that the acts and omissions of the Board, in the aggregate and under all of the circumstances, were extreme and outrageous. Scheman has set forth factual allegations sufficient to state a claim for intentional infliction of emotional distress.
III. Defamation
To prevail on a libel claim, a plaintiff must ordinarily establish that the defendant published a written statement of and concerning the plaintiff, that was both defamatory and false,[3] aind either caused economic loss or is actionable without proof of economic loss.[4] Stanton v. Metro Corp., 438 F.3d 119, 124 (1st Cir. 2006), citing White v. Blue Cross & Blue Shield of Mass., Inc., 442 Mass. 64, 66 (2004).
A statement is defamatory if it may reasonably be read as discrediting the plaintiff in the minds of any considerable and respectable class of the community. Disend v. Meadowbrook School, 33 Mass.App.Ct. 674, 675 (1992), citing inter alia Smith v. Suburban Rests., Inc., 374 Mass. 528, 529 (1978), and Sharratt v. Housing Innovations, Inc., 365 Mass. 141, 143-45 (1974). “Words not inherently disparaging may . . . have that effect if viewed contextually, i.e., in the light of attendant circumstances.” Id., citing Smith, 374 Mass. at 529-30 (letter stating that plaintiff was no longer welcome at restaurant due to her actions was susceptible of disparaging interpretation), and *92 Sharratt, 365 Mass. at 145 (in context, failure of project’s promotional brochure to mention plaintiff permitted innuendo that he had been dismissed as architect on project). If a publication is susceptible of both defamatory and harmless meanings, it presents a question for the trier of fact and cannot be ruled non-libelous as a matter of law. Sharratt, 365 Mass. at 143, citing King v. Northeastern Publ’g Co., 294 Mass. 369, 370-71 (1936).
In Disend, the headmaster of the defendant Meadowbrook School sent a letter to the parents of its fourth grade students as follows:
Recently an incident involving Donna Disend was brought to the attention of the Board of Trustees. The Executive Committee reviewed the specifics of the situation and agreed with my recommendation to terminate Mrs. Disend’s contract for the remainder of the year.
Within an hour after Mrs. Disend was asked to leave, she and her husband went into the fourth grade classroom without my permission. Mrs. Dis-end was inappropriate in the way she dealt with the children.
Please join me this evening at 8:00 P.M. in the Fourth Grade classroom so that I may explain the situation to you and plan appropriate ways to help our children through this transition.
33 Mass.App.Ct. at 675.
Although “(t]here are in the headmaster’s letter no words such as ‘dishonest,’ ‘diseased,’ ‘insane,’ or ‘bankrupt,’ any of which, if false, quite obviously denigrate the person so described),]” the Appeals Court determined that the words complained of could reasonably be understood in a defamatory sense. Id. at 674, 675. The Appeals Court stated:
[I]t does not require a fevered imagination to think that an “incident” brought to the attention of the school trustees, the “specifics” of which warranted a teacher’s immediate dismissal before the end of the academic year must have involved misconduct of an egregious sort. The complaint is pointed in claiming that the innuendo of professional misconduct damaged Disend’s reputation and her ability to earn a living as a teacher. Adding to the impression of grievous professional — or worse — misconduct is the sentence in the same letter that “Mrs. Disend was inappropriate in the way that she dealt with the children.”
Disend, 33 Mass.App.Ct. at 676.
The Defendants contend that Scheman has not alleged a factual context in which either email, though not derogatory on its face, could be understood to convey a derogatory meaning. The court disagrees.
In light of its one-line, explanation-less announcement of its last-minute removal of Scheman as head coach, it would be reasonable to understand the Board’s subsequent email — that the information it had reviewed was “extensive!,]” “confidential),]” and “warranted the steps taken!,]” and that the Board’s decision was made “as quickly as the circumstances permitted" — as conveying a derogatory meaning, i.e., that the Board’s removal of Scheman must have involved misconduct of an egregious sort. See id. at 674-76.
Thereafter, upon receiving a number of emails from parents concerned that Scheman presented a threat to their children’s safety or had engaged in some type of wrongful behavior, the Board sent an email to all team parents. Although the Board acknowledged reading all of the parents’ emails, it declined to dispel their concerns claiming that “due to the nature of the situation ALL the information!,]” including “any specifics and/or any criteria related to our decision to make the coaching change!,]” was “confidential.” In light of the attendant circumstances, this email could reasonably be understood as lending legitimacy to the parents’ concerns.[5]
Based on the assumption that all the allegations in the First Amended Complaint are true, Scheman has set forth allegations plausibly suggesting an entitlement to relief on his claim for libel.
ORDER
For the foregoing reasons, it is hereby ORDERED as follows. The Defendants’ Motion to Dismiss is ALLOWED with respect to Scheman’s claim for gross negligence and DENIED with respect to Scheman’s claim for defamation. Further, the Defendants’ Motion to Dismiss is ALLOWED to the extent that Scheman’s claim for infliction of emotional distress is based on a gross negligence theory, but DENIED to the extent that the claim is based on allegedly intentional conduct.

 Therefore, to the extent that Scheman’s claim for infliction of emotional distress is based on a gross negligence theory, that claim must be dismissed, as well.

 Although Scheman does not allege that the words used by the Defendants were false, “[b]y statute, Massachusetts permits a plaintiff to recover for a truthful defamatory statement published in writing (or its equivalent) with actual malice, G.L.c. 231, §92, except as confined by the requirements of the First Amendment to the United States Constitution.” White v. Blue Cross & Blue Shield of Mass., Inc., 442 Mass. 64, 66 n.4 (2004). As predicted by the First Circuit, “actual malice” in the Massachusetts statute permitting a true statement to form the basis of a libel action if the plaintiff proves that defendant acted with “actual malice,” refers to “malevolent intent” or “ill will." Noonan v. Staples, Inc., 556 F.3d 20, 29-30 (1st Cir. 2009). For purposes of this motion, the court finds that a malevolent intent or ill will can be inferred from, among other things, the Board's treatment of Scheman on October 19th.

 Statements that constitute libel are actionable as defamatory without proof of economic loss. Ravnikar v. Bogojavlensky, 438 Mass. 627, 630 (2003). If the statement constitutes libel, a plaintiff may recover noneconomic losses, including emotional injury and damage to reputation. Id.

 Indeed, after receiving this email from the Board, one concerned parent replied, “Since you won’t tell the parents of the team what the reason was for your decision the community is concerned that you are aware of something that would endanger our children ... If this is not a safety issue for my son and others in the community then can you at least let us know that[?]”