**STATE of Missouri, Appellant,**

v.

**Jeff D. MAGALIF, Respondent.**

No. WD 62912.

Missouri Court of Appeals,
Western District.

April 13, 2004.

Dawn Parsons, Kansas City, for appellant.

Jeff D. Magalif, Pro Se, Kansas City, for respondent.

PAUL M. SPINDEN, Judge.

After a jury found Jeff D. Magalif guilty of five counts of violating an *ex parte* order of protection and one count of stalking, the circuit court entered a judgment of acquittal notwithstanding the jury's guilty verdicts. The state had accused Magalif of harassing and stalking an employee of a restaurant next door to his house after he became angered over an odor emanating from the restaurant. We affirm in part, reverse in part, and remand the cause to the circuit court.

After Sweet Tomatoes Restaurant opened during April 2000 at 1309 Meadowlake Parkway in Kansas City, next door to Magalif's house, Magalif began protesting the restaurant's odor. He posted signs in his yard and shouted profanities at the restaurant's employees and customers. In January 2002, Magalif focused his anger on Sweet Tomatoes' kitchen manager, Stephanie Venenga, after she removed a stack of tree limbs blocking the restaurant's driveway when she arrived for work during predawn hours one morning.

On March 8, 2002, as Venenga was leaving Sweet Tomatoes, she noticed a car parked in front of the restaurant with flashing headlights and blaring its horn. She got in her car to drive it to the car to determine whether or not the person inside needed help. As she drove her car from the restaurant parking lot, Magalif drove his car to the restaurant's driveway and blocked it and made an obscene gesture at Venenga. This frightened Venenga. She backed her car into the parking lot, returned to the restaurant, and called police.

On March 12, 2002, the circuit court granted Venenga an *ex parte* order of protection, directing Magalif not to "[a]buse, threaten to abuse, molest, stalk or disturb the peace of [Venenga]" or to "[c]ommunicate with [Venenga] in any manner or through any medium[.]" Magalif received notice of the order the next day.

In this case, the state charges Magalif with five counts of violating the circuit court's *ex parte* order, in violation of § 455.085.7, RSMo 2000, and one count of stalking, in violation of § 565.225, RSMo 2000. All of the counts were misdemeanors. The jury found him guilty of all the counts. Magalif filed a motion seeking, alternatively, acquittal or a new trial.[1] Because the circuit court determined that the state did not present sufficient credible evidence, it entered a judgment of acquittal notwithstanding the jury's verdict. The state appeals.

Although the parties do not address the issue, we first consider our jurisdiction to hear this appeal. The General

---

1. Although he denominated his motion as a motion for new trial, Magalif also challenged the sufficiency of the state's evidence; hence, the state and the circuit court deemed the motion to be seeking a judgment of acquittal or new trial in the alternative.

Assembly determines the state's right to appeal. *State v. Burns,* 994 S.W.2d 941, 941 (Mo. banc 1999). In § 547.200.2, RSMo 2000, the General Assembly authorized a state appeal "in all other criminal cases [not specifically listed in § 547.210] except in those cases where the possible outcome of such an appeal would result in double jeopardy for the defendant." The state's appeal will not result in double jeopardy for Magalif.

■ The double jeopardy clause of Missouri's constitution, Mo. CONST. art. I, § 19, applies only to cases in which a defendant was "acquitted by a jury." Because the jury found Magalif guilty—it did not acquit him—the Missouri double jeopardy clause is not implicated in his case.

■ The double jeopardy clause of the U.S. Constitution, in the Fifth Amendment, also does not bar the state's appeal. Had the circuit court granted Magalif an acquittal at any point before the jury's verdicts, an appeal by the state would not be permitted because a post-acquittal appeal potentially would require "further proceedings of some sort, devoted to the resolution of factual issues going to the elements of the offense charged." *Smalis v. Pennsylvania,* 476 U.S. 140, 145–46, 106 S.Ct. 1745, 90 L.Ed.2d 116 (1986) (no appeal from acquittal granted at the close of state's case-in-chief). Double jeopardy is not implicated when a court grants acquittal after the jury's guilty verdict because no additional trial or fact-finding proceedings are necessary. The jury's verdict is simply reinstated. *United States v. Wilson,* 420 U.S. 332, 344–45, 352–53, 95 S.Ct. 1013, 43 L.Ed.2d 232 (1975); *United States v. Jenkins,* 420 U.S. 358, 365, 95 S.Ct. 1006, 43 L.Ed.2d 250 (1975), *overruled on other grounds, United States v. Scott,* 437 U.S. 82, 98 S.Ct. 2187, 57 L.Ed.2d 65 (1978). The U.S. Supreme Court explained:

When a case has been tried to a jury, the Double Jeopardy Clause does not prohibit an appeal by the Government providing that a retrial would not be required in the event the Government is successful in its appeal. When this principle is applied to the situation where the jury returns a verdict of guilt but the trial court thereafter enters a judgment of acquittal, an appeal is permitted. In that situation a conclusion by an appellate court that the judgment of acquittal was improper does not require a criminal defendant to submit to a second trial; the error can be corrected on remand by the entry of a judgment on the verdict. To be sure, the defendant would prefer that the Government not be permitted to appeal or that the judgment of conviction not be entered, but this interest of the defendant is not one that the Double Jeopardy Clause was designed to protect.

*Jenkins,* 420 U.S. at 365, 95 S.Ct. 1006 (citations omitted).

The state contends that it presented sufficient evidence and that the court erred in acquitting Magalif of all charges. The issue is whether or not the evidence, viewed in the light most favorable to the jury's verdict, was sufficient for reasonable persons to find the defendant guilty beyond a reasonable doubt with matters of credibility and inconsistencies in testimony being left to the jury's consideration. *State v. Powell,* 973 S.W.2d 556, 558 (Mo.App. 1998).

The state's evidence that an *ex parte* order of protection was in effect and that Magalif had notice of it on March 13, 2002, was not in dispute. The issue, then, is whether or not the state presented sufficient evidence from which reasonable persons could conclude, beyond a reasonable doubt, that Magalif knowingly violated the terms and conditions of the circuit court's

*ex parte* order. We consider each of the counts and the evidence supporting the jury's verdict individually.

█ Count I alleged that Magalif committed the misdemeanor of stalking. The facts alleged in the state's information were:

> [B]etween and including January 15, 2002, and June 16, 2002, ... [Magalif] repeatedly and purposely harassed Stephanie [Venenga] by blocking her vehicle with his vehicle and showing her his middle finger; by asking her if she wanted Michelle Pfeiffer to play her role in a movie; by blocking her vehicle, exiting his vehicle, placing his hands on her car and stating, "I can't wait to cross-examine you again, again, and again["]; by photographing her and her vehicle at her place of business; and by stating, "you thought you could [expletive] keep me in jail baby?!", and thereby caused substantial emotional distress to Stephanie [Venenga].

To convict Magalif of stalking, the state's burden was to establish beyond a reasonable doubt that he "purposely and repeatedly harasse[d] or follow[ed] with the intent of harassing another person[.]" Section 565.225.2. One harasses when he engages "in a course of conduct directed at a specific person that serves no legitimate purpose, that would cause a reasonable person to suffer substantial emotional distress, and that actually causes substantial emotional distress to that person." Section 565.225.1(3). A course of conduct is "a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose." Section 565.225.1(1).

The state presented sufficient evidence to establish that, between January 15 and June 16, 2002, Magalif engaged in a course of conduct directed at Venenga that served no legitimate purpose and that he intended to instill fear and apprehension in Venenga. The jury heard evidence that on March 25 Magalif walked up to Venenga as they stood outside a courtroom waiting for a hearing on the *ex parte* order against Magalif and asked Venenga whether or not she wanted Michelle Pfeiffer to portray her in a movie about Sweet Tomatoes. It heard evidence that on June 2 Magalif used his car to block Venenga's car as Venenga drove in front of his house and shouted at her that he was looking forward to cross-examining her and that on June 15 he took photographs of her and her car. The state presented evidence that on June 16 Magalif stood near Venenga as she worked on the restaurant's parking lot and shouted at her while jumping up and down. Although Magalif argues in regards to the photography incident that he was simply attempting to prepare for a hearing on the *ex parte* order, the jury was free to not believe him.

█ The only remaining issues in regard to the stalking charge are whether or not the evidence was sufficient for the jury to find beyond a reasonable doubt that Venenga actually suffered substantial emotional distress and that a reasonable person would also have suffered substantial emotional distress. The General Assembly did not define "substantial emotional distress" in § 565.225. Because the definition of "harasses" in § 455.010(10) is close to the definition of "harasses" in § 565.225.1(3), we adopt the definition of the term set out in *Wallace v. Van Pelt,* 969 S.W.2d 380, 385–86 (Mo.App.1998): a feeling of mental anguish including any unpleasant mental reaction, such as fright or worry. For the emotional distress to be "substantial," the conduct giving rise to it "must be such as would produce a considerable or significant amount of emotional distress in a reasonable person; something markedly greater than the level of uneasi-

ness, nervousness, unhappiness or the like which are commonly experienced in day to day living." *Id.* at 386. The jury heard testimony that, as Magalif continued to express his anger toward Venenga, Venenga began suffering increasing emotional distress. She told the jury that she began feeling as though she needed to look around before leaving work and that she would ask co-workers to walk with her to her car. She also carried her keys in a manner that would allow her to use them as a weapon and always carried a can of pepper spray. She eventually could not sleep because of nightmares, and she began taking sleeping pills. Venenga testified that she was "just a basket case all the time" and described her life as a "horror movie." She said that she was constantly afraid, that she would not leave her home without her husband, and that she panicked when she saw a car that was the same color as Magalif's. She said that, when she traveled out of town and thought that she saw someone who looked like Magalif, she "had an absolute attack." The jury believed Venenga's testimony that she was emotionally distressed.

The jury could also have reasonably determined that the distress was substantial and that a reasonable person would have experienced it. The circuit court, however, discounted Venenga's claimed substantial emotional distress, noting that she continued parking her car adjacent to Magalif's house as if she wanted to provoke a confrontation with Magalif. But, viewed in the light most favorable to the verdict, the evidence does not support the circuit court's concern. Venenga told the jury that the parking spots directly next to the restaurant's windows were reserved for handicapped parking and that the next closest spot to the front door and in an observable location was where she parked. She said that she would have had to walk outside for greater distances had she

parked elsewhere and that her chosen spot was "the closest available parking to the front door." When specifically asked why she did not park elsewhere after she became frightened of Magalif, she said that she was afraid that he would be hiding and she "wanted to be right in front and closest to the door" so that she could "run and make it before he could get to [her]." The circuit court erred in issuing judgment of acquittal notwithstanding the jury's verdict on Count I.

 Count II alleged that Magalif violated the circuit court's *ex parte* order by walking up to Venenga on March 25, 2002, and asking her whether or not she wanted Michelle Pfeiffer to portray her in a movie about Sweet Tomatoes. Magalif attempted to persuade the jury that Venenga's attorney looked more like Michelle Pfeiffer than Venenga did. The circuit court apparently agreed because it said in its judgment of acquittal, "It is obvious to any impartial observer that the comments regarding Michelle Pfeiffer were directed to [Venenga's attorney] and not to [Venenga]." The circuit court did not view the evidence in the light most favorable to the jury's verdict. Venenga testified that Magalif approached her, leaned to within a foot of her ear, and asked her about having Pfeiffer portray her. Venenga's attorney testified that Magalif made the comment. Although the attorney initially said that it was unclear to whom Magalif was directing his question, she added that "it seemed like it was towards [Venenga]. . . . It was my thoughts that he was directing it towards [Venenga]." Resolution of such questions is uniquely within the jury's province. The circuit court overstepped its bounds by rejecting the jury's determination that Magalif was communicating with Venenga, in violation of the *ex parte* order. The state presented sufficient evidence that, if believed, warranted the

jury's determination that Magalif made the comment and directed it to Venenga. We reverse the circuit court's judgment of acquittal on this count.

■ Count III alleged that Magalif violated the *ex parte* order by blocking Venenga's car on June 2, 2002, and saying, while putting his hands on her car, that he wanted to cross-examine her. Venenga testified that Magalif was waiting in his driveway for her to leave Sweet Tomatoes and that she had to slam on her car's brakes to avoid colliding with his car because he had pulled out of his driveway quickly to block both lanes of traffic. She told the jury that Magalif got out of his car, put his hands on her car, and started screaming at her. Other witnesses corroborated Venenga's account. Maria Burghardt, another Sweet Tomatoes employee, said that she telephoned "9-1-1" after she saw Magalif pull his vehicle out of his driveway, block Venenga's car, get out of his vehicle, and put his hands on her car. James Pearce, a police officer, testified that Magalif admitted talking to Venenga and telling her that he "would see her in court." This was sufficient evidence from which reasonable persons could find Magalif guilty of initiating communication with Venenga in violation of the *ex parte* order.

■ Count IV averred that Magalif violated the *ex parte* order by photographing her and her car on June 15. Although the state presented sufficient evidence that Magalif photographed Venenga and her car, Magalif's act of photographing Venenga and her car did not, as a matter of law, violate the *ex parte* order. The order prohibited Magalif from abusing, threatening to abuse, molesting, stalking, disturbing Venenga's peace, or communicating with Venenga in any manner. The state charged that Magalif's photographing Venenga and her car was abuse. It argues that he abused her by harassing her.

Harassment, indeed, is a form of abuse. Section 455.010(1)(d). According to the General Assembly's definition, however, abuse by harassment occurs when a person "engag[es] in a purposeful or knowing course of conduct *involving more than one incident* that alarms or causes distress to another adult and serves no legitimate purpose." *Id.* (emphasis added). A single incident of taking photographs does not establish a "course of conduct." "To qualify as harassment [under § 455.010(1)(d)] requires an allegation of a course of conduct involving a series of acts or more than one incident." *State v. Schleiermacher*, 924 S.W.2d 269, 276 (Mo. banc 1996).

■ The same is true of Count VI, which alleged that Magalif violated the *ex parte* order by honking his horn on June 28. A single incident of horn honking does not constitute abuse by harassment under § 455.010(1)(d).

Charged together in a single count, Magalif's photographing Venenga and her car on June 15 and his horn honking on June 28 conceivably made a case of abuse. This is not what the state charged in its information. By charging each act as an independent violation, the state's information failed to charge an offense. *Schleiermacher*, 924 S.W.2d at 276. The circuit court did not err in granting acquittal notwithstanding the verdict, although it did so on different grounds.

The state attempts to argue that Magalif's honking his horn and making obscene gestures constituted a communication and was, therefore, a violation of the *ex parte* order by communication. We agree that horn honking and making obscene gestures, in the right circumstances, can constitute communication, but this was not what the state charged in its information. It charged a violation of the terms and

conditions regarding abuse and none others. We, therefore, reject the argument and affirm the circuit court's judgment concerning counts IV and VI.

■ Count V averred that Magalif yelled at Venenga on June 16 as she loaded a delivery truck on the restaurant's parking lot. Venenga told the jury that Magalif, who had spent the previous night in jail for violating the *ex parte* order, returned to Sweet Tomatoes early on June 16 and stood near the restaurant and shouted at Venenga while she and others put food supplies on a truck. Venenga testified that Magalif jumped and screamed, "I'm going to get you. You. I'm going to get you." Venenga ran into the restaurant and telephoned "9–1–1." Benjamin Langel, a police officer who responded to the call, testified that he talked to Venenga and Magalif. He said that Venenga had told him that Magalif said, "You thought you could [expletive] keep me in jail, baby." Although others besides Venenga were present when Magalif made his comments, a reasonable inference to be drawn from the evidence was that Magalif was directing his comments to Venenga. Magalif had been having increasing encounters with Venenga, and the incarceration to which he referred resulted from one of those encounters. We, therefore, reverse the circuit court's judgment concerning Count V.

■ In its final point, the state argues that the court erred in granting Magalif an acquittal based on the court's perception that it committed prejudicial error in granting the state's motion *in limine* to exclude evidence that a full order of protection had been denied. Having determined that the circuit court's acquittal notwithstanding the verdict was improper, we still address the point because the issue will manifest itself on remand.

The state misconstrues the circuit court's judgment. Although the circuit court expressed a belief that it prejudicially erred by not allowing Magalif to tell the jury that the circuit court had refused to issue a full order of protection, it did not rely on the perceived error as a ground for granting acquittal. The circuit court said:

> Having determined that it was prejudicial error to exclude the evidence of the denial of the full order of protection, it is necessary to determine if a new trial is warranted on counts I through VI. In my opinion, it would be legally wrong to retry [Magalif.] The charges and facts are very thin supports for the conviction as it is.

The circuit court then examined the evidence supporting the state's case and determined that it was insufficient for a reasonable jury to have found Magalif guilty of the charged offenses. The effect of the circuit court's decision avoided the issue of whether or not a new trial was warranted. The circuit court did not, as the state contends, grant the acquittal based on evidence not presented to the jury.

Nonetheless, our holding that the circuit court's acquittal on Counts I, II, III and V must be reversed resurrects the issue of whether or not a new trial is warranted. This, however, is a matter to be addressed by the circuit court on remand. *See State v. West,* 939 S.W.2d 399, 401 (Mo.App. 1996); *State v. Couch,* 793 S.W.2d 599, 601 (Mo.App.1990) (remand for determination of claims in motion for new trial appropriate when post-verdict motion for acquittal found improperly granted). If the circuit court determines that it did commit prejudicial error and that a new trial is warranted, it shall enter the appropriate order.

The state argues that evidence regarding the denial of a full order of protection was logically and legally irrelevant and that the circuit court properly excluded it.

We decline review of the point because reviewing it would have the effect of allowing the state to use this appeal to accomplish indirectly what it could not accomplish directly: obtain appellate review of whether or not a new trial is proper. *State v. Ring,* 86 S.W.3d 481, 484 (Mo.App. 2002); *State v. Carter,* 78 S.W.3d 786, 789 (Mo.App.2002).

We, therefore, affirm the circuit court's judgment of acquittal notwithstanding the verdicts as to Counts IV and VI. We reverse its judgment as to Counts I, II, III and V. We remand the cause to the circuit court for it to consider a motion for new trial.

LISA WHITE HARDWICK, Presiding Judge, and THOMAS H. NEWTON, Judge, concur.