

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | |
|---|---|
| STATE OF MISSOURI, | ) |
| | ) |
| Respondent, | ) |
| | ) WD80831 |
| v. | ) |
| | ) OPINION FILED: |
| | ) January 29, 2019 |
| MATTHEW BURL FRYE, | ) |
| | ) |
| Appellant. | ) |

**Appeal from the Circuit Court of Cole County, Missouri
The Honorable Daniel R. Green, Judge**

**Before Division Three:** Mark D. Pfeiffer, Presiding Judge, and
Lisa White Hardwick and Anthony Rex Gabbert, Judges

Mr. Matthew B. Frye ("Frye") appeals from the judgment entered by the Circuit Court of Cole County, Missouri ("trial court"), following a bench trial in which he was found guilty of the class D felony of harassment. The trial court sentenced Frye to four years' imprisonment, suspended execution of that sentence, and placed Frye on supervised probation for five years. Frye asserts that the evidence was insufficient for the trial court to find him guilty of harassment and that section 565.090(4)[1] was unconstitutionally overbroad and vague. We affirm.

---

[1] All statutory references are to the REVISED STATUTES OF MISSOURI 2000, as supplemented through the 2014 noncumulative supplement, unless otherwise indicated.

**Facts and Procedural History**[2]

In September 2015, C.B. was fourteen years old and in the eighth grade. She was a member of her middle school's wrestling team and participated in a youth wrestling club for children five years old through eighth grade. Frye was forty-seven years old and volunteered as a coach for the younger members of the wrestling club; he never coached C.B. personally. When C.B. was in seventh grade, she received a Facebook friend request from Frye. When she realized that he was one of the wrestling coaches, she accepted his friend request. Although Frye did not have contact with C.B. at wrestling practice, they did have contact on Facebook messenger.

Among the messages:

- Frye told C.B. that he told C.B.'s friend that she could be a model, and "if she wanted to take pics . . . [he] could do it and she could model whatever different stuff she wanted," and "then [C.B.'s friend] asked if [C.B.] could come, which was fine with [Frye]." He told C.B., "And I don't mean this in a bad way so please don't take it wrong." C.B. interpreted the message as Frye wanting to take nude pictures of her and her friend. C.B. never arranged a time to take photos with Frye, but "[h]e tried to do that with [them]."

- Frye wrote: "I would just take the day off work and we could do it as a photo shoot. . . . So please don't take more into that than what it was meant. . . . What do you think?" C.B. thought Frye's message "was creepy," and it made her feel "[w]eirded out, creeped out."

- Frye messaged, "[W]ould it be wrong to ask? . . . If you and [C.B.'s friend] wanted to do something fun with me. I mean, like go fishing or get ice cream or something like that. . . . Don't be taking that the wrong way." C.B. thought a forty-seven-year-old man who was not a member of her family should not ask her to do those things.

---

[2] In an appeal from a bench trial, we view the facts in the light most favorable to the verdict. *State v. Lee*, 498 S.W.3d 442, 446 n.1 (Mo. App. W.D. 2016).

2

- Frye asked C.B., "Can I say you sweet and pretty. . . . Sorry. That didn't come out right." C.B. did not think that it was appropriate for Frye to say such things, and his message made her feel "[c]reeped out."

- Frye asked C.B. about whether she had kissed her boyfriend. Frye's question made C.B. feel: "Weirded out. Creeped out."

- Frye asked C.B. whether she had practiced kissing. He asked, "What kind of kiss do you want? . . . You want just a nice, soft kiss or French kiss? . . . Sorry, I was just asking." When C.B. saw the message, her reaction was, "That's just creepy. That's just wrong."

- Frye messaged C.B., "What is the deal with all of this bi stuff. . . . I hear so many girls say that they are bi, bisexual. . . . Oh, I knew you were straight. . . . Would have loved to fish today. You were busy all week." C.B. thought Frye was asking if she was bisexual or not, but she did not feel comfortable talking about her sexuality.

- Frye messaged C.B.: "I hear you can't wrestle anymore. . . . Was it because we talk too much?"

- When Frye learned that C.B. had been babysitting, he told C.B., "I could use a babysitter for me. I'm always in trouble. . . . Could you handle that?" C.B. asked, "Handle what?" Frye replied, "Me. I'm a little bad boy. You're so pretty." His response made C.B. feel "[c]reeped out."

- Frye told C.B., "You['re] too young yet, I think, but I love back-roading. . . . [W]e [can] get ice cream [and] then go driving, although I used to do other things, not eating." C.B. thought Frye was talking about "sexual things."

- Frye told C.B., "Only if I were younger. . . . Don't take that bad. . . . Sorry if that sounds wrong." C.B. thought Frye meant that "he wanted to try and get with me."

- Frye messaged C.B.: "You're a hot chick." That message made C.B. feel "[u]ncomfortable, not right, creeped out."

- Frye told C.B. about the "[b]est week of [his] life" with a girl when he was younger, that he "still remember[ed] everything we did in that old red, cherry red [C]amaro. . . . Don't share that with anyone. . . . I think I got three hours sleep a night that whole week." C.B. thought Frye meant he "got with some girl in the back of a car."

- After C.B. sent Frye a picture of her sunburned shoulder, Frye asked whether she was laying out topless. C.B. thought, "there was something not right with him. It wasn't right."

C.B. did not receive any messages from other wrestling coaches. When C.B. saw Frye at the wrestling club, she felt scared "[b]ecause I was afraid that he might like come after me or something. . . . [L]ike, he would try and come and kidnap me. . . . Rape me or kill me." C.B. did not tell her mother ("Mother") about Frye's messages because C.B. thought Frye was a high school wrestling coach and if she told Mother and got him in trouble, he would sabotage her high school wrestling career.

On September 28, 2015, Mother inspected C.B.'s Facebook to make sure C.B. was "following the rules" regarding her permitted use of social media. While Mother was examining C.B.'s Facebook, new messages were sent to C.B. by Frye. Mother initially thought Frye was a relative on C.B.'s father's side of the family. Mother opened one of the messages and then, after noticing that there were messages that had been sent between midnight and 2:00 a.m., started reading some of the messages Frye had previously sent to C.B. After reading the messages, Mother "locked [C.B.] out of her Facebook immediately" by changing C.B.'s Facebook

4

passwords. Mother's husband, a deputy with the Cole County Sheriff's Office, called the police. He was "highly upset" by the "inappropriate messages" discovered on C.B.'s Facebook page.

Thereafter, Detective Andrew Evans of the Boone County Cyber Crimes Task Force took over the investigation. Detective Evans interviewed C.B. and questioned her about her communication with Frye. C.B. told the detective that she and Frye had been communicating for about a year. During the interview, Detective Evans observed that C.B. was visibly upset and, on several occasions, was almost in tears. Detective Evans submitted a preservation request to Facebook for Frye's account and C.B.'s account. Search warrants were obtained for those Facebook accounts and for Frye's residence.

Detective Evans interviewed Frye at his residence on September 29. Frye was cooperative. He admitted that he had a Facebook account, that C.B. was one of his Facebook friends, and that he would "say hi to [her] and visit with [her] every once in a while." Detective Evans gave Frye a *Miranda*[3] warning, informed Frye that a complaint had been received regarding C.B. receiving inappropriate messages on Facebook from Frye, and questioned him about those messages. After the interview, Detective Evans arrested Frye for felony harassment.

The State filed a superseding indictment on March 14, 2017, charging that Frye, in violation of section 565.090, committed the class D felony of harassment by communicating with C.B. by Facebook messages. On the morning of trial, April 27, 2017, Frye filed a motion to dismiss, alleging that "[i]f this medium is indeed criminalized under the 2015 version of the statute th[e]n this Court must find that the statute as it existed is unconstitutionally overbroad and vague." Defense counsel argued that the statute was unconstitutionally vague and was an unconstitutional restriction on free speech. The trial court denied the motion.

---

[3] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

At trial, the State called Mother, Mother's husband, C.B., and Detective Evans to testify. During Detective Evans's testimony, he described the process of "grooming":

> [A] perpetrator finds a child or someone who are under the age of 18 in the State of Missouri, that they have some interest in, they will try to befriend them whether that be through a social media app or in person. Get to know them. When they feel comfortable enough, they will start trying to talk about different topics that may not be comfortable at first, kind of test the waters, kind of thing. Maybe sexual innuendos, maybe to see how comfortable they are of these conversations. A lot of times they will talk about their sexualities, their experiences with either men, boys, girls, maybe talk about some of their own experiences. Just to kind of create that comfort level to move forward with the grooming process.

Detective Evans testified that based on his training and experience, Frye was grooming C.B. for future contact. The audio recording of Detective Evans's interview with Frye was admitted into evidence and played for the trial court. Frye did not testify at trial or present any evidence. The trial court found Frye guilty as charged and sentenced him to four years' imprisonment, suspended execution of that sentence, and placed Frye on supervised probation for five years.

Frye timely appealed.

## Point I – Sufficiency of the Evidence

### Standard of Review

"In reviewing the sufficiency of the evidence in a court-tried criminal case, the appellate court's role is limited to a determination of whether the [S]tate presented sufficient evidence from which a trier of fact could have reasonably found the defendant guilty." *State v. Twitty*, 506 S.W.3d 345, 346 (Mo. banc 2017) (internal quotation marks omitted). "The evidence and all reasonable inferences therefrom are viewed in the light most favorable to the verdict, disregarding any evidence and inferences contrary to the verdict." *Id.* (internal quotation marks omitted).

## Analysis

In Frye's first point on appeal, he asserts that the trial court erred in finding him guilty of harassment because the State did not present sufficient evidence that he recklessly caused emotional distress to C.B. Frye was charged by superseding indictment with the class D felony of harassment in violation of section 565.090, in that he, a person twenty-one years of age or older, knowingly communicated by Facebook messages with C.B., a person who was seventeen years of age or younger, and in doing so without good cause recklessly caused emotional distress to C.B.

Section 565.090 provides in pertinent part that:

1. A person commits the crime of harassment if he or she:

. . . .

(4) Knowingly communicates with another person who is, or who purports to be, seventeen years of age or younger and in so doing and without good cause recklessly frightens, intimidates, or causes emotional distress to such other person[.]

§ 565.090.1(4). "Harassment is a class A misdemeanor unless . . . [c]ommitted by a person twenty-one years of age or older against a person seventeen years of age or younger," § 565.090.2(1), in which case, "harassment shall be a class D felony," § 565.090.2 (2).

Section 562.016.4 provides that "[a] person **'acts recklessly'** or is reckless when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." "'Frighten' is a word of common usage and definition." *State v. Vaughn*, 366 S.W.3d 513, 521 (Mo. banc 2012) (internal quotation marks omitted). "'Intimidate' and 'emotional distress' are also words with common understanding." *Id.* at 521-22. While section 565.090.1(4) does not specify that the emotional distress be

7

"substantial," the Missouri Supreme Court has held that "the resulting effects [of acts that cause immediate fright, intimidation, or emotional distress] must be substantial" to prevent the statute from being unconstitutionally overbroad. *Id*. at 521 & n.6.

Although typically found in common-law torts, "emotional distress" is also used in Missouri's stalking statute, along with "frighten" and "intimidate." *Id*. at 522 n.7 (citing § 565.225, RSMo Supp. 2008). "Since the legislature chose not to define substantial emotional distress as it pertains to stalking, the fact finder is to apply the terms in their commonly understood meanings." *State v. Baker*, 40 S.W.3d 392, 395 (Mo. App. W.D. 2001) (internal quotation marks omitted). The term "emotional distress," as used in the stalking statute, means "a general or specific feeling of mental anguish such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry and nausea." *Id*. (internal quotation marks omitted). Under the stalking statute, "[f]or the emotional distress to be 'substantial,' the conduct giving rise to it must be such as would produce a considerable or significant amount of emotional distress in a reasonable person; something markedly greater than the level of uneasiness, nervousness, unhappiness, or the like which are commonly experienced in day-to-day living." *State v. Magalif*, 131 S.W.3d 431, 435-36 (Mo. App. W.D. 2004) (internal quotation marks omitted).

Frye claims that his conduct did not rise to the level described in *Magalif*. He asserts that he never did anything to make C.B. uncomfortable when he saw her in public. He contends that the State used the harassment statute to criminalize speech the State found distasteful coming from an older adult male, and that no one would suggest harassment occurred had the speech come from a teenage boy. He argues that C.B. had the ability to ignore or stop receiving his messages at any time but, instead, voluntarily responded to them.

Frye contends that he was not reckless in his communication with C.B. because C.B. "never did anything to put [him] on notice that he made her feel even remotely uncomfortable" in that C.B. never told him to stop messaging her, never told him his messages were concerning to her, and never told him his messages were inappropriate. Contrary to Frye's contention, his own words reveal that he knew there was a substantial and unjustifiable risk that his messaging would cause C.B. emotional distress. When Frye asked to conduct a photo shoot with C.B., he told her, "I don't mean this in a bad way so please don't take it wrong," and "please don't take more into that than what . . . was meant." When Frye asked C.B. if she wanted to go fishing or get ice cream with him, he asked, "Would it be wrong to ask," and said "Don't be taking that the wrong way." When Frye asked C.B., "Can I say you sweet and pretty," he followed up with, "Sorry. That didn't come out right." When Frye asked C.B. whether she had practiced kissing and what kind of kisses she wanted, he said, "Sorry. I was just asking." Additionally, when Detective Evans interviewed Frye and questioned him about his messages to C.B., Frye agreed that his messages were "probably not" appropriate, admitted that "it looks really bad," and agreed that what he did was "creepy." Frye's statements disclose that he was aware that his messaging could cause C.B. emotional distress, but he chose to consciously disregard that risk by sending the messages anyway.

There was also substantial evidence that Frye's conscious disregard of the risk that his messaging would cause C.B. emotional distress constituted a gross deviation from the standard of care which a reasonable person would exercise in that situation. Frye was forty-seven years old and coached the younger members of the youth wrestling club to which fourteen-year-old C.B. belonged. C.B. had never spoken to Frye at practice. When C.B. received a Facebook friend request from Frye, at first she did not recognize that he was one of the wrestling coaches.

9

Even after C.B. accepted Frye's friend request, they did not have contact at wrestling practice. Despite this lack of a public, personal relationship, Frye sent C.B. messages with sexual overtones, telling her that she was "sweet and pretty" and "a hot chick" and that he wanted her to do something fun with him, telling her that they could do a photo shoot and she could model whatever she wanted, asking about whether she had kissed her boyfriend and what kind of kissing she wanted, asking about her sexuality, asking whether she sunbathed topless, and telling her about his past sexual experiences. Detective Evans testified at trial that based on his training and experience, the content of Frye's Facebook messages to C.B. was consistent with the "grooming" process. Thus, there was sufficient evidence from which the trial court could have found that Frye grossly deviated from the standard of care which a reasonable person would exercise in the situation.

The State also presented sufficient evidence from which the trial court could have reasonably found that Frye's messages caused C.B. to suffer emotional distress. C.B. testified that Frye's messages were "creepy" and made her feel "[w]eirded out" and "[c]reeped out." The sexual overtones in the messages made her feel "[u]ncomfortable, not right, creeped out." C.B. testified that when she saw Frye at the wrestling club, she felt scared "[b]ecause I was afraid that he might like come after me or something. . . . [L]ike, he would try and come and kidnap me. . . . Rape me or kill me." Viewing the evidence and all reasonable inferences therefrom in the light most favorable to the verdict, and disregarding any evidence and inferences to the contrary, there was sufficient evidence from which the trial court could have found Frye guilty of harassment in that he knowingly communicated with C.B., who was seventeen years of age or younger, and in so doing recklessly caused C.B. to suffer emotional distress markedly greater than commonly experienced in day-to-day living.

Point I is denied.

## Point II – Constitutionality of Statute

In Frye's second point on appeal, he asserts that the trial court erred by not sustaining his motion to dismiss the superseding indictment because section 565.090(4) violates the First and Fourteenth Amendments to the United States Constitution in that the statute is overly broad and is vague.[4]

## Standard of Review

"Whether a statute is constitutional is reviewed *de novo*." *Vaughn*, 366 S.W.3d at 517. "Statutes are presumed constitutional and will be found unconstitutional only if they clearly contravene a constitutional provision." *Id*. "The person challenging the validity of the statute has the burden of proving the act clearly and undoubtedly violates the constitutional limitations." *Id*. (internal quotation marks omitted). "If a statutory provision can be interpreted in two ways, one constitutional and the other not constitutional, the constitutional construction shall be adopted." *Id*. (internal quotation marks omitted). "Statutory terms not defined by the legislature are considered 'in their plain or ordinary and usual sense.'" *Id*. (quoting § 1.090).

---

[4] In this appeal, Frye has moved to transfer this case to the Missouri Supreme Court, arguing that we should transfer because he challenges the constitutionality of a statute, a matter reserved for the exclusive jurisdiction of the Missouri Supreme Court. We took Frye's motion to transfer with the case and deny it for the reasons stated below.

The Missouri Supreme Court has exclusive jurisdiction in cases involving the validity of a state statute under article V, section 3 of the Missouri Constitution. However, a party's mere assertion that a statute is unconstitutional does not deprive the court of appeals of jurisdiction. *State v. Williams*, 420 S.W.3d 713, 717 (Mo. App. W.D. 2014). The allegation concerning the statute's constitutional validity must be real and substantial for jurisdiction to vest in the Supreme Court. *Id*. If the challenge is merely colorable, the court of appeals has jurisdiction. *Id*. A constitutional claim is:

> substantial when, upon preliminary inquiry, the contention discloses a contested matter of right, involving some fair doubt and reasonable room for controversy; but, if such preliminary inquiry discloses the contention is so obviously unsubstantial and insufficient, either in fact or law, as to be plainly without merit and a mere pretense, the claim may be deemed merely colorable.

*State v. Stone*, 926 S.W.2d 895, 898 (Mo. App. W.D. 1996) (internal quotation omitted). Because the Missouri Supreme Court has considered the constitutionality of language in section 565.090 at issue here in *State v. Vaughn*, 366 S.W.3d 513 (Mo. banc 2012), we determine that Frye's constitutional challenge is merely colorable, and this court has jurisdiction.

**Analysis**

Section 565.090.1(4) criminalizes a person who:

> [k]nowingly communicates with another person who is, or who purports to be, seventeen years of age or younger and in so doing and without good cause recklessly frightens, intimidates, or causes emotional distress to such other person[.]

Frye claims that section 565.090.1(4) is unconstitutionally overbroad and vague. He argues that by sending C.B. Facebook messages, he neither invaded C.B.'s privacy nor was reckless because C.B. had the ability to block his messages but, instead, responded to them without indicating that the messages were unwanted. He suggests that "[o]ne can imagine any number of scenarios where a person may communicate with someone who is less than 17 years of age causing emotional distress."

The overbreadth doctrine is limited to cases implicating First Amendment concerns. *State v. Jeffrey*, 400 S.W.3d 303, 309 (Mo. banc 2013). "'The constitutional guarantees of freedom of speech forbid the States to punish the use of words or language not within narrowly limited classes of speech.'" *Vaughn*, 366 S.W.3d at 518 (quoting *Hess v. Indiana*, 414 U.S. 105, 107, 94 S. Ct. 326, 38 L. Ed. 2d 303 (1973)). "Invalidation for overbreadth is 'strong medicine that is not to be casually employed.'" *Id*. (quoting *United States v. Williams*, 553 U.S. 285, 293 (2008)). "[T]he right of free speech is not absolute at all times and under all circumstances." *Chaplinsky v. State of New Hampshire*, 315 U.S. 568, 571, 62 S. Ct. 766, 86 L. Ed. 1031 (1942). "There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem." *Id*. at 571-72. "These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those which by their very utterance inflict injury . . . ." *Id*. at 572. "[S]uch utterances are no essential part of any exposition of ideas, and are of such slight social value as a

12

step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." *Id.*

In *State v. Vaughn*, the Missouri Supreme Court considered the constitutionality of section 565.090.1, subdivisions (5) and (6), RSMo, Supp. 2008. 366 S.W.3d 513. Mr. Vaughn argued that subdivisions (5) and (6) violated his right to free speech under the First Amendment to the United States Constitution and article I, section 8, of the Missouri Constitution, in that the prohibitions were overbroad on the face of the statute. *Id.* at 517. Mr. Vaughn also argued that subdivisions (5) and (6) were vague and violated his right to due process found in the Fourteenth Amendment to the United States Constitution. *Id.*

The Supreme Court found that subdivision (5) criminalized any person who knowingly communicated more than once with another individual who did not want to receive the communications. *Id.* at 519. The Court observed that "[a]lthough the statute purports to criminalize 'harassment,' subdivision (5), **unlike the other subdivisions**,[5] does not require the conduct to actually harass in any sense of the word. Rather, it criminalizes a person who

---

[5] Section 565.090.1, RSMo Supp. 2008, provided:

A person commits the crime of harassment if he or she:

(1) Knowingly communicates a threat to commit any felony to another person and in so doing frightens, intimidates, or causes emotional distress to such other person; or
(2) When communicating with another person, knowingly uses coarse language offensive to one of average sensibility and thereby puts such person in reasonable apprehension of offensive physical contact or harm; or
(3) Knowingly frightens, intimidates, or causes emotional distress to another person by anonymously making a telephone call or any electronic communication; or
(4) Knowingly communicates with another person who is, or who purports to be, seventeen years of age or younger and in so doing and without good cause recklessly frightens, intimidates, or causes emotional distress to such other person; or
(5) Knowingly makes repeated unwanted communication to another person; or
(6) Without good cause engages in any other act with the purpose to frighten, intimidate, or cause emotional distress to another person, cause such person to be frightened, intimidated, or emotionally distressed, and such person's response to the act is one of a person of average sensibilities considering the age of such person.

*See Vaughn*, 366 S.W.3d 516 n.2.

'knowingly makes repeated unwanted communication to another person.'" *Id*. at 519 (emphasis added) (footnote omitted). The Court held that section 565.090.1(5) was unconstitutionally overbroad on its face because it criminalized communication protected by the First Amendment: "'It is firmly settled that under our Constitution the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers.'" *Id*. at 520 (quoting *Street v. New York*, 394 U.S. 576, 592, 89 S. Ct. 1354, 22 L. Ed. 2d 572 (1969)).

As to section 565.090.1(6), which criminalized a person who, "without good cause, engages in any other act with the purpose to frighten, intimidate, or cause emotional distress to another person, or causes such person to be frightened, intimidated, or emotionally distressed," the Court concluded that subdivision (6) was neither unconstitutionally overbroad nor unconstitutionally vague.

The *Vaughn* Court read the elements of section 565.090.1(6) in total and determined that subdivision (6) was not overbroad in that "the legislature apparently intended to bar the sort of conduct that causes an immediate reaction of fright, intimidation, or emotional distress," which "are the sort of acts that inherently tend to inflict injury or provoke violence." 366 S.W.3d at 521. "Such activity is unprotected by the First Amendment." *Id*. (citing *Chaplinsky*, 315 U.S. at 571-72). "As construed, the statute applies only to acts outside of the First Amendment's protection. Because the statute limits its application to a 'core' of unprotected expression, it is not overly broad." *Id*. (internal quotation marks omitted). Similarly, section 565.090.1(4) is not overly broad because, like section 565.090.1(6), it bars activity that causes "an immediate reaction of fright, intimidation, or emotional distress," which "tend[s] to inflict injury." *Vaughn*, 366 S.W.3d at 521.

"The Due Process Clause requires that state criminal statutes demonstrate a basic level of clarity and definiteness." *State v. Faruqi*, 344 S.W.3d 193, 199 (Mo. banc 2011). "'No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids.'" *Id*. (quoting *Lanzetta v. New Jersey*, 306 U.S. 451, 453, 59 S. Ct. 618, 83 L. Ed. 888 (1939)). A statute is sufficiently clear and not void-for-vagueness if "ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Id*. at 199 (internal quotation marks omitted). The *Vaughn* Court found that "frighten," "intimidate," and "emotional distress," as used in section 565.090.1(6), are all words of "common usage and definition" with "common understanding." 366 S.W.3d at 521. Because subdivision (6) did "not predicate culpability on the subjective reaction of the victim" but, instead, used "a reasonable person standard," it "place[d] the public on notice of the level at which conduct creates culpability," thereby providing "reasonable notice of the conduct it prohibits." *Id*. at 522. The same analysis applies to Frye's challenge to subdivision (4). Thus, section 565.090.1(4) is not void for vagueness.

Point II is denied.

## Conclusion

The trial court's judgment is affirmed.

/s/ *Mark D. Pfeiffer*
_____
Mark D. Pfeiffer, Presiding Judge

Lisa White Hardwick and Anthony Rex Gabbert, Judges, concur.

15